CHARLES H. WALTER, Plaintiff in Error, *v.* THE PEOPLE, Defendants in Error.

The statute (L. 1858, ch. 332, § 1) providing that "on any trial for any offense punishable by death, etc., the people shall be entitled peremptorily to challenge five of the persons drawn as jurors for such trial," is constitutional.

The Constitution of 1846, in preserving the right of trial by jury in all cases in which it had been theretofore used, does not limit or restrict the authority of the legislature, except as to the particular right guaranteed.

The subject of peremptory challenge has always been under legislative control; and if it were a right given by common law, the legislative will could regulate it.

Where a juror has conscientious scruples against finding a party guilty of an offense punishable with death, he may be challenged for principal cause by the people. (2 R. S., 734, § 12.)

So where a juror states that he is unwilling to be sworn, in such a case, because of such scruples, it is a sufficient ground for such challenge.

On trial for the crime of murder, the relation of husband and wife, between the prisoner and deceased, cannot be proved by reputation, or by the statements of the deceased prior to the murder.

Sanity is the presumed normal condition of the human mind, and it is never incumbent upon the prosecution to give affirmative evidence of the existence of such state in a particular case.

THE plaintiff in error was indicted, and in February, 1864, tried, in the New York Court of General Sessions of the peace, for the murder of Nancy E. Vincent.

The homicide occurred under the following circumstances: The deceased had been living in a house of prostitution in Centre street some four weeks before the homicide. The proof tended to show that she had been intimate with the prisoner, and was called at this house by the name of "Lizzy" and "Lizzy Walters." On the evening of the 27th November, 1863 (Friday), Walter visited her. They went into a room, and, after coming out, went away together. She was absent until Sunday morning, when she returned to the house alone. On Sunday evening, the prisoner again came to the house, and wanted her to go away with him; but she would not go. They had loud words, and he struck her; still she persisted in staying. Finally the woman who kept the house put

him out. He met a policeman, and charged the deceased with stealing his watch. The officer took them both to the station house, when the prisoner complained that she had stolen his watch, and she charged him with assaulting her. They were both locked up for the night, and in the morning the officer took them before a magistrate at the Tombs. Neither would make any charge against the other, and they were discharged and went away together. The house of prostitution was opposite the Tombs, and the woman who kept it (having got up early for that purpose), watched to see the deceased and prisoner come out of the Tombs. She took the deceased into her house, and told Walter if he came there she would have him arrested. The deceased then got into bed with another of the inmates of the house. Some two or three hours afterward, the prisoner came to the house. He first broke into the room of the keeper of it, and then into the room where the deceased was sleeping. After pulling her out of bed, he commenced beating and stabbing her with a knife. It was in a small, dark room; and while he was thus engaged, the girl with whom she was lying, jumped up, lit the gas, and alarmed other inmates of the house, one of whom struck him with a bottle upon the head. He dropped his knife, went into the bar room, from thence into the street and to the station house, where he gave himself up. The deceased was still in her room, where she was bleeding profusely. There were stabs upon her shoulders, back, neck, stomach, legs and other parts of her body — seventeen or eighteen wounds in all. The police officers took her to the hospital. She died seven days afterward, from inflammation of the bowels produced by these wounds.

On the trial, a juror was called and challenged peremptorily by the district attorney, and set aside by the court, the prisoner's counsel objecting,

A juror named *Thompson* being called, the prisoner's counsel challenged him for principal cause, without specifying any ground. He was sworn, and after testifying in answer to the counsel's questions, that he was an engineer; had lived in New York twenty-seven years; and that he knew nothing of the prisoner or the case, the prisoner's counsel remarked, we

are content with this juror, and withdraw the challenge. The district attorney then put this question to him : " You have no conscientious scruples, have you ? The juror answered: " Yes, I have. I have conscientious scruples." The prisoner's counsel then asked: " If you were sworn to render a verdict according to the evidence, you would respect your oath and do so, would you not ?" The juror answered: " I would, sir ; but I should not feel willing to be sworn in the case." The court said : " The juror objects to being sworn ; I will exclude him." The prisoner's counsel objected, and the court noted the objection.

On the cross-examination of the woman who kept the house of ill fame, the prisoner's counsel put this question, " For what purpose was she (the deceased) living with you ?" The district attorney objected, and the court refused to permit the question to be put, and the prisoner excepted.

The captain of the sixth precinct police testified, that he investigated the matter of the prisoner and deceased when they were brought to the station house, on Sunday night. The prisoner charged her with stealing his watch, and she him with assaulting her. The district attorney then put the question : " What did she say about being his wife ?" Prisoner's counsel, " I object." The court said : " The question is proper ; the prisoner was present." The witness answered, " I asked her if she was his wife, and she said, ' no ;' but that she had lived with him as his wife for two or three years, and that he had come to where she was, and beat her because she would not go with him." The district attorney then asked : " Did she say anything in his presence as to her name ? " The witness answered under objection of prisoner's counsel, " Yes ; I asked her what her name was. She gave the name of Nancy E. Vincent. It was so written down in the book at the time. I have the book here." (The book was shown and the entry in it read.) " The entry was ' Charles Walters ; ' also ' Nancy E. Vincent,' both detained."

The home surgeon of the New York City Hospital, who attended deceased before her death, was called as a witness.

The district attorney put to him this question: "Do you remember that a woman by the name of Nancy E. Vincent was brought to the hospital; and if so, when?" Answer. "I remember that a woman, whose name was entered on the register as Nancy E. Vincent, was brought there." Prisoner's counsel objected to what appeared upon the register as to her name being given in evidence. The court said: "There is no ground for the objection."

The nurse of the City Hospital, who had charge of the deceased whilst she was there, was inquired of whether she learned the name of the deceased; and if so, how. The witness answered: "After she was brought into the ward, a board was brought in with the name of Nancy E. Vincent on it. I went to her and asked her if that was her name. and she nodded her head, and said, " Yes ; I always go by the name of Elizabeth Walters, but that is not my true name." The prisoner's counsel moved to strike out this answer, but the court decided that the answer was proper.

On the part of the defense, one Nancy Hogan, a girl living with the deceased in the house in Centre street, was examined as a witness, and testified, that she always knew her by the name of Elizabeth Walters; sometimes wrote letters for her to her husband. Two letters being shown, she said, I wrote these letters for her; I wrote and signed them just as she told me to; she received letters from him; she could read them and could not write much; I never heard her called by any other name than Elizabeth Walters.

The prisoner's counsel then offered to read in evidence the letters shown to and identified by the witness, as having been written for her as tending to establish the relation of husband and wife between them; and also to show, that in them she publishes her name as Elizabeth Walters. The district attorney objected to their being read, and they were ruled out by the court.

One of these letters offered and rejected, was dated " New York, Oct. 16, 1863." It commenced " Dear Charley," and ended " from your loving wife, Lizzie Walters." Upon the

envelope, was the address, "Charles H. Walters, David's Island Hospital," and the post-office stamps of "New York, Oct. 19, 1863." Another of the letters was dated "Oct. 21." It commenced "My dear Charley," and closed, "I remain your dear wife, Elizabeth Walters." Upon the envelope of this letter was a similar address, with the post-office stamp of the date of October. The third letter was dated "November, 10, 1863." It began "My dear husband," and ended "Your loving wife, Elizabeth Walters." This letter seems not to have been addressed.

The prisoner's counsel called W. T. Hollester, and stated to the court that he could prove by that witness, that the deceased and the prisoner had lived together at a hotel kept by the witness in the city, as man and wife. The court said that that was not a legal way of proving that they were so in a case like this; and the matter was dropped, the witness not being sworn.

The prisoner's counsel then read in evidence by consent, a letter addressed to the district attorney, from Dr. Ranney of the New York City Lunatic Asylum, dated 1st February, 1864. This letter stated in substance, that on the 28th and 30th January, 1864, at the request of the district attorney, he had examined the prisoner as to his mental condition, and found no evidence of insanity. From the representations of Walter, and a verification of some of them by an examination of his person, the doctor was inclined to the opinion, that there was in his case an irritable or diseased condition of the *dura mater;* which would be greatly aggravated by a debauch, and the stimulants taken would be likely to affect the mind much more seriously, than if there were no previous disease of that membrane.

The counsel for the prisoner asked the court to charge the following propositions:

*First.* That premeditated malice cannot be inferred alone from the manner of killing, nor the means employed, however cruel the one or dangerous the other.

*Second.* That, in a case like the present, where the defense consists in the insanity of the prisoner, it becomes incumbent on the prosecution to prove him sane.

*Third.* If Nancy E. Vincent was not the name the deceased was known by among her acquaintances, and in the community in which she lived, and Elizabeth Walters was the name by which she was known, the jury must acquit.

The judge refused to charge as requested, except so far as the propositions were embraced in the charge he was about to make.

. The judge then proceeded to charge the jury. After explaining the offense of murder, under the statute, he continued: "to maintain the prosecution, the district attorney has to establish, *first*, that a murder has been committed; and, *secondly*, you must be satisfied that the prisoner has committed the murder, and intended at the time to take the life of the deceased. The intent must be completely made out. The law presumes malice from the mere act of killing, because the natural and probable consequences of any deliberate act are presumed to have been intended by the author. If the person went to the house with the intent to kill the deceased, or if he went there, without intending at the time he got hold of her and pulled her out of bed, if a minute before the blow was struck, he conceived the intent to take life, then he is guilty of murder. But if you are of the opinion from all the evidence, that he did not intend to take life, but that the blow was struck in the heat of passion, then you can convict him of manslaughter in one of the degrees." The judge then read the statutes relating to manslaughter, and said, "if you think the evidence warrants it, you will convict under either of these degrees. You must look at the evidence in order to gather the intent, or what is termed the malice of the act. (The judge here repeated the testimony.) Now you can judge, gentlemen, of the intent from the nature of the weapon used, and the character of the blows inflicted, in order to ascertain whether, at the time when he struck the blow, he intended to take life or not. This is a question for your determination."

With regard to the question of insanity the judge charged: "Let me ask you to scrutinize this case closely, and see if you can discover any evidence before you, of the insanity

of this man. All that has been relied on (and that is the only evidence in the case) is the letter of Dr. Ranney on that subject. (The court then read the letter of Dr. Ranney.) Now this is the whole statement, and it is on it the prisoner's counsel relies, that this man was insane at this time. You have no evidence before you of the antecedents of this man; you have no evidence that, at any time, he was deranged or out of his mind, or that he was in that state as to induce the belief that he was mentally diseased. Allowing that the prisoner has raised sufficient before you to create a doubt as to his sanity, it will be my duty to lay down certain rules to guide you in your deliberations. Insanity, to be effectual as a defense, should show that at the time the alleged offense was committed, the prisoner, in consequence of partial insanity, was laboring under such a defect of reason as not to be conscious of the nature, character, and consequence of the act, or that he knew that the act was wrong. Partial insanity is not, by law, an excuse for crime, and can only be so when it deprives the party of his reason, in regard to the act charged to be criminal. That, on this view, the prisoner is entitled to the benefit of any reasonable doubt you may entertain of his guilt, in view at the time of committing this crime he was insane; and, therefore, not responsible for the act. If, upon the whole evidence in the case, you are satisfied that, by reason of partial insanity, the prisoner, at the time the alleged offense was committed, was laboring under such a defect of reason as not to be conscious of the real nature and character of the act, you should acquit him.

At the close of the charge, the district attorney requested the court to call the attention of the jury to the evidence in regard to the name given by the deceased in the station house, in the presence of the prisoner.

The court said: So far as the name is concerned, gentlemen, you recollect the evidence, the name given by herself was that of Nancy E. Vincent. I think the nurse at the hospital testifies to that fact, and there is no other evidence in the case, with the exception of the letters which were ruled out (wherein the girls who acted as her amanuenses

signed the letters as Elizabeth Walters). This is the evidence in the case on that point. It is for you to decide whether her name has been correctly stated or not.

On the district attorney remarking that the name of Nancy Vincent, given in the presence of the prisoner by herself, he is bound by, the court said: The rule is correctly stated. If a person makes an allegation in the presence of another, and he stands by it silently, it is conceived in law to be an assent. He stood by and did not contradict what she said to Capt. Jourdan. You will remember the fact that she said she was not his wife, and that she intended to live with him no longer.

No objection was taken by the prisoner's counsel to any part of the charge as given.

The jury rendered a verdict of guilty of murder in the· first degree.

The prisoner brought error to the Supreme Court, where the judgment of the General Sessions was affirmed. He now brings error to this court.

*S. H. Stuart,* for the plaintiff in error.

I. The prosecution has no peremptory challenges, and the law awarding to the people the right to make peremptory challenges is unconstitutional. The crown had no challenges in the case of murder at common law. " The king could not challenge in murder without having cause." (Moor, 595.) All peremptory challenges shall be taken by the prisoner himself. (Jacob's Du. Challenges, 4 Black., 353; and 1 Chitty, 534.)

Aside from our statute, the State has no peremptory challenges; and at the time of our first Constitution (1777), the prisoner's right of trial by jury at common law, afforded the prosecution no right to deprive him of a juror of his choice without cause.

Hence, neither the Constitution of 1777, § 41, nor that of 1822, art. 7, § 2; nor that of 1846, art. 1, § 2, gave any such power, or permitted the legislature to give any; but, on the contrary, forbade it.

It is submitted, that the statutes of Edward, upon the subject of challenges, were common law here at the incoming of this government. (See 1 Bishop Cr. Law, § 11.)

II. The rejection of the juror is an error fatal to the validity of the conviction.

III. It is unlawful for the court to permit the jury, in a capital case to separate, even with the consent of the prisoner.

*A. Oakey Hall*, for the People.

I. The first juror, Benjamin Bennet, was properly challenged, and excluded. 1. He was peremptorily challenged under the statute. (Laws of 1858, ch. 332, p. 557.) 2. It is a constitutional statute. The Constitution preserves the right of trial by jury, as existing at common law; and at common law the crown had such challenge. (O'Coighlin Trial, 26 St. Tr., 124; *Queen* v. *Geach*, 9 C. & P., 499.) 3. The statutes do not confer the right, but provide against its undue exercise. (Joy on Chall., § 4.) The statute permits five peremptory challenges to the people in capital cases. Prior to the statute it was a vexed question whether the people had peremptory challenges. (*Pro. People* v. *Canniff*, 2 Park. Cr., 586; *People* v. *Masters*, 3 id., 517; *Con. People* v. *Atchinson*, 7 How., 241; *People* v. *Humis*, 1 Park. Cr., 579.)

II. Robert C. Thompson was properly excluded by the court *ex mero motu.*

He was also properly excluded on a statutory challenge for principal cause by the people, as one having constitutional scruples against the death penalty. (*Damon's Case*, 13 Wend., 351.)

The court acted substantially as trier, and excused him, and the decision of the trier is not reviewable. (*People* v. *Martin*, 4 Wend., 229.)

III. The third and fourth excluded jurors were properly excluded under *Damon's Case (supra)*.

IV. All the offers relating to the question of marriage,

whether of declarations or writings, were properly over-ruled.

1. The question of marriage was only important to raise a variance in the name of the deceased. But, whether deceased was married or not, her name was not, in law, changed from Vincent.

2. The true question was, did the indictment so describe the woman as to identify her when the evidence came in?

3. The evidence shows that she was known by the name set forth in the indictment.

V. The hospital evidence was competent, because it was material to show an identity of the woman who died under the name of Elizabeth E. Vincent, with her who was stabbed and sent to the hospital under that name.

VI. The judge properly refused to charge, "that premeditated malice cannot be inferred alone from the manner of the killing, nor the means employed, however cruel the one, or dangerous the other."

The manner and the means, evidenced by seventeen stabs, showed malice, if the perpetrator thereof was sane.

A man is presumed to intend the natural consequences of his own acts. (*York's Case*, 9 Metc., 93.)

The question of premeditated malice was one of fact, to be found by the jury, and not one of law, to be determined by the court. (Whar. Hom., p. 46.) The jury could infer the premeditation from the manner and the means. (*People* v. *Darry*, 10 N. Y., 139; Whar. Hom., p. 39.)

VII. The second request was substantially charged by the judge.

VIII. The third request to charge was legally improper; its terms *limited* the name of deceased to her reputed name, which would have been improper.

IX. The entire charge was correct, and was upheld by the opinion of the General Term.

The city judge charged, "that the intent must be clearly made out, otherwise they could not convict; that they must look to the evidence to gather the intent, or what is termed the malice of the act."

WRIGHT, J.    In this case we exercise, as an appellate tribunal, a peculiar jurisdiction.    It was a conviction for a capital offense in the New York Court of General Sessions of the peace, and it is provided by statute that on appeal we may order a new trial, if satisfied that the verdict was against the weight of evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below. (Laws of 1855, ch. 337, § 3.)    The case is, therefore, open to review upon the facts and the law, regardless of any technical omission to except to the rulings of the trial court.

1. *As to the merits.*    Was the verdict justified by the evidence, or was it against the weight of it?    There seems to be no room to claim that it did not sustain the conviction.    Indeed, its tendency was in but one direction.    That a woman named in the indictment, Nancy E. Vincent, was killed by the prisoner in a brothel in Centre street under circumstances of great atrocity was not denied.    It was not, as it could not be claimed, that the death was unintentionally affected; and hence the theory of the defense was, that the act was committed whilst the prisoner was in a state of mental derangement.    There was no proof, however, tending to show that he was, or ever had been, insane; and nothing even to raise a suspicion of mental unsoundness, unless it were the exceeding barbarity attending the perpetration of the crime.    What were the antecedents, or the precise relation which the parties sustained to each other, does not appear.    It is probable that they were strangers in the city, and that an intimacy had existed between them elsewhere.    The evidence first discloses them together at the brothel in Centre street, on Friday evening previously to the homicide.    She had then been an inmate some four weeks of this den of iniquity.    That evening the prisoner visited her, and they left the place together, she remaining absent until Sunday morning, and then returning alone.    On Sunday evening he was again at the house, and a quarrel ensued.    He endeavored to persuade her to go away with him but she refused, and he struck her.    She still persisted in staying, and finally the keeper of the house put him

out. In a brief period, he came back with a policeman and charged her with stealing his watch. Both were taken to the station house, when the prisoner complained that she had stolen his watch, and she charged him with assaulting her. They were locked up for the night, and at an early hour on Monday morning taken before the magistrate, and, refusing to complain against against each other, were released from custody. The brothel was opposite the Tombs, and as they came out together the woman who kept it took her in, and told the prisoner if he came there she would have him arrested. At this time all vicious passion that may be supposed to have been aggravated by a debauch the night previously, had had full opportunity to subside. He went away, and the deceased got in bed with another of the girls of the house. Two or three hours elapsed when the prisoner returned. He was first met in the rear yard of the house, inquiring where the deceased was. He then went into the house, burst open the door of the room of the keeper of the house, which was next to the bar-room, and who happened at the time to be absent; and next broke in the door of the room in which his victim was sleeping. A scene then ensued of the most brutal description. Dragging his victim out of the bed, he threw her upon the floor, beating her and stabbing her with a knife. The alarm was given that "Walters was killing Lizzy," but before he could be forced off he had stabbed her in seventeen places upon her shoulders, back, neck, stomach, legs and other parts of the body. He seems not to have desisted from his violence until a girl named Riley, who came to the rescue, struck him upon the head. He then got up, dropped his knife, went into the bar-room, and from thence into the street. The deceased was placed upon the bed in a fainting condition, her wounds bleeding profusely; and the same day was taken to the city hospital, where she died seven days afterward, of the wounds thus inflicted by the prisoner. Whether the outrage was perpetrated under the excitement of stimulants, was not hown; and there was nothing in the subsequent conduct of the prisoner to indicate insanity. He seems fully to have

appreciated what he had been about, for, on leaving the house, he went to the station house and gave himself up.

In view of these facts, there could have been but a single question for the jury, viz.: whether the malicious intent existed to kill. If it did, it was murder in the first degree. (Laws of 1862, ch. 197, §§ 5, 6.) This question was submitted with instructions as to the law entirely unexceptionable, and the jury found that the malicious purpose of the prisoner to take the life of his victim actually existed. No other conclusion could have been conscientiously reached. The evidence and circumstances attending the homicide showed, unmistakably, deliberation and malice on his part. He voluntarily sought out his victim, armed with a knife, and with fiendish spirit and intent, effected her death.

2. It remains to be seen, whether in the course of the trial, any rule of law was violated actually prejudicing the prisoner.

1. A juror was called and peremptorily set aside on a challenge by the people, the counsel for the prisoner objecting. This was not error. It is provided by statute that " on any trial for any offense punishable by death or by imprisonment in the State prison for the term of ten years, or for a longer term, the people shall be entitled peremptorily to challenge five of the persons drawn as jurors for such trial and no more." (Laws of 1858, ch. 332, § 1.) This is claimed to be an unconstitutional enactment, but with what provision of the Constitution it conflicts, is not apparent. The Constitution of 1846, it is true, preserves the trial by jury, in all cases in which it had been theretofore used (Const., art. 1, § 2), but this certainly is no limitation of, or restriction upon legislative power, except as to the right guaranteed, viz., a jury trial in all cases in which it had been used before the adoption of the instrument. I am not aware of any other constitutional provision that may be supposed to have the remotest bearing upon the question. Trial by jury cannot be dispensed with in criminal cases, but it is obviously within the scope of legislation to regulate such trial. I entertain no doubt that it is entirely competent for the legislature to declare that either the people or the accused may have their challenges without assigning

cause, and to limit the number of them. The subject of peremptory challenge has always been under legislative control, and it is only within a comparatively recent period that the right has been extended even to the accused in a minor class of criminal offenses. Even if it were a right given by common law, it could be restrained, limited or withheld altogether at the legislative will.

2. A juror named Thompson, was challenged for principal cause, no ground of challenge being specified. He was sworn, and first interrogated by the prisoner's counsel. After answering that he had no recollection of having read or heard anything about the case, the counsel remarked, "we are content with this juror," and withdraw the challenge. The district attorney then put the question: "You have no conscientious scruples have you?" He promptly replied, "Yes, I have. I have conscientious scruples." The prisoner's counsel then inquired. "If you were sworn to render a verdict according to the evidence, you would respect your oath and do so, would you not? He answered. "I would sir, but I should not feel willing to be sworn in the case." The case states that the judge then said, "the juror objects to being sworn, I will exclude him." The prisoner's counsel objected, and the judge noted the objection. Excluding or excusing this juror, against the prisoner's objection, it is insisted was an error fatal to the validity of the conviction. I think otherwise. A challenge for principal cause had been informally interposed by the prisoner's counsel. The counsel, after a brief examination, announced that he was content with the juror, and that he would withdraw the challenge. The district attorney informally renewed it, and put to him the question, whether he had conscientious scruples, and he replied that he had. It was not specified in the question or answer to what the scruples of conscience related, but it is obvious that the juror, the court and the prisoner's counsel understood them as relating to the propriety of the death penalty in any case. Just before, and it is to be assumed in the presence and hearing of the juror, a person had been called as a juror, and questioned by the attorney for the people, as to having consci-

entious scruples against finding a verdict according to the evidence in a case where the penalty was death; and upon Thompson answering that he had conscientious scruples, the prisoner's counsel followed up the examination with the view of ascertaining whether, as a juror under the obligations of his oath, he could not overcome them. If the juror conscientiously entertained opinions that would preclude him from finding a party guilty of an offense punishable with death, it was a good ground of challenge for principal cause by the people. The statute provides that such person shall not be compelled or allowed to serve as a juror on the trial of an indictment for any offense punishable with death. (2 R. S., 734, § 12.) I think the proof sustained a challenge for principal cause, and that in this view the exclusion was not error. It is true that the juror answered when pressed, as any conscientious man would have done, that if forced to serve, and sworn to render a verdict according to evidence, he would respect his oath, but he added that he should not feel willing to be sworn in the case. This answer did not remove the objection to him. The substance of it was, that if compelled to serve he would respect his oath, but he was not willing to be sworn in a case, were the punishment following a conviction was death. It was in the nature of an objection by the juror himself to serve in the particular case. It appearing that he was one having conscientious scruples against the death penalty, he was legally incompetent as a juror, and it was the duty of the court, in the due administration of the law, with or without objection on his part, to exclude him from the panel.

3. In cross-examining the woman who kept the house in which the deceased had been an inmate for three weeks before the murder, the prisoner's counsel put this question: "For what purpose was she (the deceased) living with you?" On objection of the district attorney, the court would not allow the question to be answered. The inquiry was irrelevant and unimportant, except in its bearing upon the fanciful and wholly unproved defense attempted to be set up, that the deceased was the wife of the prisoner, who, in his absence in a

military hospital, had been inveigled into a house of ill-fame, and there led into practices of illicit commerce with men, which, when it became known to the prisoner, so operated upon a mind long affected by insanity, that it produced an insane phrensy, and drove him to the commission of the act for which he was being tried. If, in any view, however, it was important that the jury should have been made acquainted with the fact that the deceased was a common prostitute, it was fully shown. It was conceded and proved that the witness kept a bawdy house, and that the deceased had lived with her for three or four weeks, at least, prior to her death. It was quite unnecessary, with the view of showing her to have been led into practices of illicit commerce with men, that the keeper of the vile den should have been allowed to answer the question propounded to her. It is clear, therefore, that the prisoner could not have been prejudiced by this ruling, even if it were conceded that the interrogatory was unobjectionable.

4. Three letters were produced on the part of the defense, and shown to a girl named Hogan, who was an inmate of the house in Centre street. She identified the letters as having been written by her for the deceased. Two of them purported to be addressed to "Charles H. Walter, David's Island Hospital," and the third was without any address. They were signed "Lizzie Walters," and "Elizabeth Walters." All of them concluded "Your loving wife," and the one without an address commenced, "My dear husband." The witness testified that they were written and signed just as the deceased told her to do. The prisoner's counsel offered to read these letters in evidence; but the district attorney objecting on the ground of irrelevancy, they were ruled out. The avowed purpose of the offer was to establish the relation of husband and wife, between the prisoner and the deceased, and also a variance between the indictment and the proof as to her true name; in other words, that her name was not Nancy Vincent, as the indictment alleged, but Elizabeth Walters. I do not think the court erred in excluding the evidence. Whether the relation of husband and wife existed,

was entirely immaterial, except upon the question of variance. If the woman that he killed was the wife of the prisoner, then her name must have been Walters, and not Vincent. That she was his wife, and not his mistress, could not be proved in this way; and the fact, that at the date of the letters, she claimed among her associates at the house of prostitution to be his wife, and called her name Walters, was no evidence that they were really husband and wife, or that Vincent was not her true name. It may be here remarked, that the judge erred in the opinion, that in a case like the present, to establish the relation of husband and wife, direct proof of marriage was required; but the prisoner was in no way prejudiced by the error. There was no evidence whatever in the case of cohabitation between the parties in such a sense, as with proof of common reputation might raise a presumption of marriage. The prisoner had the benefit of all the evidence of common reputation which he could produce.

5. If Nancy Vincent was the real name of the person upon whom the prisoner committed the fatal assault, the indictment was not defective; and although she may have went by another name among her acquaintances, the jury could not acquit on the ground of variance. There can be no variance where the indictment states the name truly. Nor is there a fatal variance when the name charged is not the true one, but it is proved that the deceased was known and called among her acquaintances by the name charged. Upon the point whether the indictment stated correctly the name of the deceased, there was ample evidence to go to the jury. Indeed there was but the single fact proved, that among her associates in the house in Centre street, she published her name as Elizabeth Walters, to raise a question respecting it. In the station house, the night previously to the homicide, when the prisoner and herself were complaining against each other to the police officer, she gave her name as Nancy E. Vincent, and stated that she was not the wife of the prisoner, but that she had lived with him as his wife for two or three years. To these statements, in the presence of the prisoner, he made

no contradiction or objection, but on the contrary was prefer-
ring a charge against her for stealing his watch. So, also,
when she was taken to the City Hospital, and placed in one
of the wards, a board was brought in with the name of Nancy
E. Vincent upon it. The nurse asked her if that was her
name, and she·said "Yes; I always go by the name of Eliza-
beth Walters, but that is not my true name." It is true, the
prisoner was not present on the latter occasion, but that was
not necessary to render the proof competent. If it were, the
evidence worked no prejudice to him. She but reiterated out
of his presence, the name she had given in his presence, un-
contradicted by him.

6. The prisoner's counsel requested the judge to charge as
a proposition of law, that in a case where the defense consists
in the insanity of the prisoner, it becomes incumbent upon
the prosecution to prove him sane. There was not a particle
of evidence in this case showing the prisoner to have been
insane when he committed the homicide. The defense of
insanity failed utterly. Hence, the legal proposition asked to
be given to the jury was of the most abstract character, and
for this reason the judge was not called upon to say anything
about it. But as an abstract legal proposition, it was mani-
festly unsound. Sanity is presumed to be the normal state
of the human mind, and it is never incumbent upon the prose-
cution to give affirmative evidence that such state exists in
a particular case.

My conclusion is, that the judgment should be affirmed.
The prisoner had a fair trial on the merits in the court below,
and he was not prejudiced by the violation of any legal rules.
The evidence of his guilt, and the justice of his conviction, is
very clear.

Judgment affirmed, and ordered that the court below fix
anew the time for the execution of the plaintiff in error.