## COURT OF APPEALS,
### May, 1906.

# THE PEOPLE *v.* JOHN JOHNSON.

### (185 N. Y. 219.)

(1). MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of a defendant, indicted for the murder of his wife, examined and held sufficient to sustain a verdict convicting him of the crime of murder in the first degree.

(2). EVIDENCE—WHEN THREATS, REMOTE IN TIME, ARE COMPETENT.

Threats made by a husband to his wife, about five months before the time he killed her, are competent as evidence against him when it appears that they were repeated from time to time until shortly before the homicide, since they show that the state of the defendant's mind toward the deceased as disclosed thereby, was continuous and they bear with more or less force, according to the circumstances, upon malice and premeditation; and an objection, that the threats were incompetent because it was shown that the defendant and his wife met afterwards and that their relations appeared to be friendly, is not well taken because it bore on the probative force of the threats rather than upon their competency.

(3). WITNESSES—EVIDENCE OF A CHILD UNDER TWELVE YEARS OF AGE —(CODE CRIM. PRO. § 392)—TRIAL COURT PRESUMED TO HAVE EXAMINED CHILD AS TO INTELLIGENCE.

Where, upon the trial of an indictment for murder, the evidence of a child under twelve years of age was received, though not given under oath, under the provisions of the statute (Code Crim. Pro. § 392), and the record is silent as to whether any preliminary examination of the child, concerning his competency and intelligence, was held by the court, there is no presumption that the statement was taken without any effort on the part of the court to see whether the child understood the nature of an oath, or was of sufficient intelligence to justify the reception of the evidence without an oath; on the contrary, the trial justice is presumed to have done his duty in accordance with the statute; in any event, the question cannot be raised for the first time upon appeal where no objection was interposed or request made so that a ruling could have been made by the trial court, especially where the other evidence was ample to warrant a conviction.

(4). Constitutional Law—"Due Process of Law"—The Statute (Code Crim. Pro. § 392) Permitting the Unsworn Evidence of a Child to be Received in a Criminal Case Not Unconstitutional.

The term "due process of law," used in the Bill of Rights and embodied in the Constitution (Const. art. 1, § 6), means "law in its regular course of administration through the courts of law," or "a regular trial according to the course and usage of the common law." It does not mean that the legislature cannot charge rules of evidence as they existed at common law, nor make one a competent witness who was not such at common law. Hence, the statute (Code Crim. Pro. § 392) permitting the unsworn statement of a child under twelve years of age to be received in a criminal case is not void as violating the guaranty of the Constitution that no person shall "be deprived of life, liberty or property without due process of law." The statute extinguished no right, but simply so regulated the procedure as to admit the evidence of a child under the age of twelve years, provided the court should be of the opinion that he did not understand the nature of an oath, but was possessed of sufficient intelligence to justify the reception of his statement. It limits the effect of such testimony by providing that no conviction can be founded upon it unless it is supported by other evidence. It permits the unsworn statement to be received for what it is worth, subject to the test of cross-examination, and does not do away with oaths or affirmations generally, but only in a particular instance where the oath would be useless and yet the evidence might be valuable.

Appeal from a judgment of the Supreme Court, rendered October 27, 1905, at a Trial Term for the county of Westchester, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*James M. Hunt* for appellant. In view of the manner in which the unsworn statement of defendant's son, Edward Johnson, was presented to the jury, justice requires that a new trial be had within the provisions of section 528 of the Code of Criminal Procedure. (*Wheeler* v. *U. S.,* 159 U. S. 523; *People* v. *Barberi,* 149 N. Y. 256; *People* v. *Raffo,* 180 N. Y.

434; *Birch* v. *Newberry,* 10 N. Y. 374; *Westervelt* v. *Gregg,.* 12 N. Y. 202; *People* v. *Sickles,* 156 N. Y. 541; 29 Am. & Eng. Ency. of Law, 764; 1 Greenl. on Ev. § 328; Best on Ev. § 154; *People* v. *Frindel,* 58 Hun, 482;. *People ex rel. Kasschau* v. *Board of Police Comrs.,* 155 N. Y. 40.) This record does not contain sufficient evidence of premeditation and deliberation sufficient to support a conviction of murder in the first degree. (*People* v. *Barberi,* 149 N. Y. 256, 267; *People* v. *Raffo,* 180 N. Y. 434.)

*J. Addison Young* for respondent. The statement made by the defendant's son, Edward Johnson, was properly received in evidence (*People* v. *Gralleranzo,* 54 App. Div. 360; *Walter* v. *People,* 32 N. Y. 147; *People* v. *Petrea,* 92 N. Y. 143.)

VANN, J. The indictment charged the defendant with the murder of Katharine Johnson, his wife, on the 15th day of May, 1905, at the city of Yonkers, in the county of Westchester. Upon the trial it appeared that the defendant was married to the deceased about thirteen years before the homicide, but they had not lived together for the period of eight years immediately preceding. She was thirty-eight years old, and he was thirty-seven. They had two children, Stephen, aged twelve, and Edward, aged eight or nine. The deceased lived with her mother at No. 13 Moquet place, in the city of Yonkers, and the children lived with her. While the defendant did not live with his wife he sought her company, and they met occasionally. He frequently expressed to her his desire that they should go to housekeeping again, and he often sent or gave her money. He was proud of his children and warmly attached to them. Evidence was given tending to show that within eight months prior to her decease, on four separate occasions, he had threatened his wife with violence. In September, 1904, after a slight disagreement, he put his hand upon her, but not forcibly, so far as

appears, and said: " For two pins I would shut your wind off."
In the month of December following he said to her, " I will
smash you. I will kill you before I let you go." In March,
1905, an observer saw him pulling his wife down certain stone
steps leading from one street to another and she said, " Let me
go." She ran up the steps twice and he pulled her down twice,
saying the second time, " Before I let you go I will kill you."
This occurred at about two o'clock in the morning. During the
same month they had a quarrel, and as she was getting off a
street car he took her by the arm, called her an offensive name
and said, " You come with me. You are no good." Later in
the day they were seen quarreling on the street near her home,
and a day or two afterward her throat was swollen on the out-
side but she said she had the grip. On the 21st of April, 1905,
after some words she said to him that she did not want to speak
to him, and he said to her, " If I know that you had any such
idea as that I would blow your brains out." On the same oc-
casion he said to her, " I will never go behind Sing Sing bars
until I go for you." These quarrels and threats did not im-
press some of those who observed them as of serious moment.

This is substantially all the information that the record fur-
nishes as to the relations of the parties and their conduct toward
each other until May 15th, 1905, the day of the homicide. The
defendant did not go to work that day, because he had a sore
foot. He was living with his sister at No. 39 Riverdale avenue,
in the city of Yonkers, and at a little after eight o'clock in the
evening he wrote a note to his wife asking her why she did not
come down on Friday night as she had promised. He sent this
note to her by his niece, and she sent back word by the same
messenger that she was not coming down any more and that she
didn't want him " coming up there." He soon started for the
house where his wife resided and reached there at about nine
o'clock in the evening. She was sitting on a little porch in
front with her two sons and a friend named Margaret O'Brien.

Upon arriving where they were the defendant stood in front of the porch, rested his left hand on the banister, and with his right hand under his coat on his hip pocket, he said to his wife: " I want to see you." She answered: " I am here." He then said: " Is this the way you intend to treat me ? " She replied: " I gave you all the satisfaction I am going to give you," and turning to one of her sons, said: " Get me a match until I light the lamp and put you to bed." The boy went in, got a match and brought it out to his mother, and as she rose to her feet the defendant shot her with a revolver which he had drawn from his right hip pocket. He was so close to her when he fired that the powder marked her face. The bullet struck her just below the right eye, took an upward course, and penetrating the brain, caused instant death. This was the version of the three eye witnesses, except that the lad Edward stated that after the defendant fired at his wife he said, " Son of a bitch, take this," and ran away. The other witnesses did not hear this statement, but they testified that they heard the defendant mutter something that they did not understand. The defendant went at once to police headquarters, surrendered himself, and said, " I done it because I loved her." He made a statement, which he signed after it had been reduced to writing by one of the officers.

. The district attorney produced this statement during the trial, and, handing it to the counsel for the defendant, said that he would offer it in evidence if the counsel wished " it to go in evidence; if he objects it cannot go in evidence." The next day it was read in evidence, the counsel for the defendant saying that he had no objection, and as the defendant was not sworn and no witness was called in his behalf, we give the substance of it as his version of what occurred.

. After stating that in answer to his note to his wife she sent back word that she was not coming down any more and did not want him to come up there, he continued: " This message was delivered by my niece in person. After I received the mes-

8

sage from my niece I felt kind of mad and got ready, dressed myself and went up to see her and when I got up there I found her sitting on the stoop in company with another girl, named Maggie O'Brien.   When I got to the stoop I said to my wife, ' I want to see you ' and she said, ' I am here if you want to see me.'   I said to her, ' What is the matter with you ?   Why do you treat me like this ? '   She said, ' I am treating you just as good as you are treating me.'   I stood there fully five minutes before I said another word.   I says to her, ' I ask the same question again, do you intend to treat me like this ? ' and she said, ' I won't treat you no better ' and then the accident happened.   Then I shot her.   Q. How much time elapsed after the last talk was had until you shot her ?   A. About two minutes. Q. Why did you wait so long before you shot her ?   A. I waited to see if she wouldn't give me any satisfaction.   Q. How long have you had this revolver ?   A. About four or five weeks. Q. Did you ever carry this revolver about your person before to-night ?   A. No, this was the first time.   Q. Had you been drinking to-day ?   A. No, I have not drank any intoxicating liquor in four or five years.   Q. Why did you carry the revolver with you to-night ?   A. That is a question that I can't answer.   I don't know why I did it.   Q. Did you think that if she did not do what was right you would kill her ?   A. No, I did not have any intention to kill her and I just thought I would scare her.   Q. Did you ever tell her that if she didn't come and live with you you would kill her ?   A. I said it once or twice in a fooling way.   Q. When was the last time that you said that to her as near as you can remember ?   A. I guess about a month ago.   Q. What was the conversation about at that time ?   A. A sort of a quarrel.   Q. What was the quarrel about ?   A. About starting to go housekeeping.   Q. What did she say to you at that time when you threatened to kill her ?   A. She said, ' Go ahead.   I am ready if you are.'   Q. Was it after one of these quarrels that you bought the revolver ?   A. No, before it.

Q. When did the quarrel before the last one take place? A. Well, we've been quarreling off and on for the last two or three months. Q. Then it was after one of the quarrels that you got the revolver? A. Yes." He closed by saying that his wife did not know that he had the revolver, but his sister did. The revolver was taken from his pocket by the police when he gave himself up, and five loaded cartridges were found therein, with the shell of one that had been discharged.

The case was clearly for the jury, both as to the alleged guilt of the accused and as to the degree of his guilt. The killing was admitted. There was some evidence of motive and ample evidence of time for deliberation. The defendant said in his statement, not by eager assertion, but quite incidentally, that he shot his wife by accident. In response to the question why he waited so long after the last talk before he shot her, he answered that he waited to see if she wouldn't give him any satisfaction. He had never carried the revolver before, although he had owned it for some time, and he could not tell why he carried it that night. When asked if he thought he would kill her if she didn't do what was right, he answered that he did not intend to kill her, but thought he would scare her.

It was for the jury to say what part of the statement was true and what part, if any, was false. By accepting a part as true they were not bound to accept all as true, if they thought it was unreasonable under the circumstances. As to what was said and done at the time of the shooting there is no material difference between the statement of the defendant and that of the witnesses for the People, except as to the remark said by the younger boy to have been made right after the shot was fired. What was passing through the mind of the defendant during the period of two minutes which elapsed after the final announcement by the deceased that she would treat him no better, we cannot say, but the jury had the right to infer that during that period he decided to kill and then shot intending to kill.

They are presumed from their verdict to have so found and we do not think their conclusion was unreasonable or against the weight of evidence. The verdict must stand unless some error of law, raised by objection and exception, was committed on the trial, or some injustice was done the defendant, which, although not objected to, was so grave and serious in character that we must presume it affected the result.

The only exception appearing in the record was taken to a ruling of the court admitting evidence of threats made in December, 1904, about five months before the homicide. This was objected to as too remote, " especially in view of the fact that the evidence already put in by the prosecution shows friendly feelings on behalf of the deceased and the defendant after that." The evidence received subject to this objection and the exception to the ruling was as follows: " The witness testified that she heard some one quarreling in Nepperhan avenue and when she got near enough she saw the deceased and her husband standing together." She heard him say to her, " I will smash you," and she replied, " I dare you." He then said, " I will kill you before I let you go." The witness heard no more and aparently saw no more but passed on her way.

Evidence of recent threats have always been held competent in cases like this and they are regarded as of especial importance when the accused claims that the homicide was excusable or justifiable. (*People* v. *Gaimari,* 176 N. Y. 84, 95, 17 N. Y. Crim. 490. ) The threats objected to were made in December, about five months before the homicide and when they were received it had already been shown that the defendant had made similar threats in March, which was about two months, and on the twenty-first of April, which was less than one month before the homicide. Even remote threats are competent when it appears that they were repeated from time to time until shortly before the commission of the offense alleged. They show that the state of the defendant's mind toward the deceased, as dis-

closed thereby, was continuous and bear with more or less force, according to the circumstances, upon malice and premeditation. Repeated threats, covering a period of nearly nine years, were held competent in *Commonwealth* v. *Holmes* (157 Mass. 233, 240) and four years in *State* v. *Hoyt* (46 Conn. 330, 336). Threats not repeated, made two years before the homicide were received in *Jefferds* v. *People* (5 Parker Crim. Rep. 522, 559) and fourteen months before in *Commonwealth* v. *Crowe* (165 Mass, 139, 141.)

The objection that the threats were incompetent because it was shown that the defendant and his wife met afterward and that their relations appeared to be friendly, was not well taken because it bore on the probative force of the threats rather than upon their competency. If his object was to get her to live with him he might resort to threats at one time and kind acts at another. If the evidence tended to show that he killed her because he thought she had finally decided to have nothing more to do with him, the threats may have even greater significance on account of her occasional manifestations of friendship.

During the trial the young lad Edward Johnson, who said he was eight years old, but his grandmother swore he was nine, was called as a witness for the People. The record does not disclose that the trial justice examined the child before his statement was taken, but simply says that when he was called as a witness on behalf of the People the court said: " Take his statement without being sworn." Thereupon his statement was taken without objection or suggestion of any kind and, so far as it goes, it is in substantial accord not only with the evidence of the other two eye witnesses but with the statement of the defendant himself, except in the single particular already pointed out.

Section 392 of the Code of Criminal Procedure, as amended by chapter 279 of the Laws of 1892, is as follows: " The rules of evidence in civil cases are applicable also to criminal cases,

except as otherwise provided in this Code. Whenever in any criminal proceedings a child actually or apparently under the age of twelve years offered as a witness does not in the opinion of the court or magistrate understand the nature of an oath, the evidence of such child may be received though not given under oath if, in the opinion of the court or magistrate, such a child is possessed of sufficient intelligence to justify the reception of the evidence. But no person shall be held or convicted of an offense upon such testimony unsupported by other evidence."

It is now insisted that we must presume from the silence of the record that the statement was taken without any effort on the part of the court to see whether the child understood the nature of an oath, or was possessed of sufficient intelligence to justify the reception of the evidence without an oath. We think that no such presumption arises, but, on the contrary, that the trial justice is presumed to have done his duty and to have satisfied himself by an examination of the child that the course pursued was in accordance with the statute. The certificate attached to the record is simply that it " contains all of the evidence given upon the trial of the action." The preliminary examination by the presiding justice as to the competency of a witness of tender years is not evidence in the action. It is not addressed to any issue, and is for the consideration of the court only, not of the jury. It is usually an informal conversation upon indifferent subjects, designed to put the child at ease so that he will talk naturally. His intelligence and ability to tell the truth are tested by noting his answers and his general appearance. If the counsel who tried the case for the defendant wished to raise the question now argued by his successor upon this appeal, he should have made some request, or interposed an objection, or brought the subject to the attention of the court in some way so that a ruling could have been made. He could not remain silent and leave the question to be raised for the first time upon appeal. The defendant was not convicted

upon the unsupported testimony of the lad, for the other evidence was ample to warrant the verdict.

It is further contended that the statute is void because it violates the guaranty of the Constitution that no person shall be deprived of life, liberty or property without due process of law. Due process of law means "law in its regular course of administration through the courts of law" (Miller on the Constitution, vol. 2, p. 664); or "a regular trial according to the course and usage of the common law." (Lincoln's Const. Hist. vol. 4, p. 37.) These definitions are in accordance with the rule laid down in Magna Charta where the phrase originated: "No man, of what estate or condition that he be, shall be put out of his land or tenement; nor taken, nor imprisoned, nor disinherited, nor put to death, without being brought to answer by due process of law." (Magna Charta, An. 1354, 28 Edward III, cap. 39.)

Due process of law does not mean that the legislature cannot change the rules of evidence as they existed at common law, nor make one a competent witness who was not such at common law. Indeed the provision "that no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief," seems to leave the door open in all other respects. (Const. art. 1, § 3.) Statutes making parties and the husband or wife of a party, competent to testify; changing the rule regulating challenges to jurors; providing for a special commissioner of jurors and for special juries in criminal cases; authorizing the perpetuation of certain testimony respecting the title to a particular estate; authorizing the physical examination of the plaintiff in actions for personal injuries; declaring what shall be received by the courts as presumptive evidence, provided the fact proved has a fair connection with the main fact to be proved; declaring the effect of recitals in tax deeds, and of ex parte affidavits in town-bonding acts and statutory foreclosures; and changing in other respects the common-law rules of

evidence and the common-law competency of witnesses, may be referred to as instances sustained by the courts. (*Stokes* v. *People,* 53 N. Y. 164, 171; *Howard* v. *Moot,* 64 N. Y. 262, 268; *Board of Comrs. of Excise* v. *Merchant,* 103 N. Y. 143; *People* v. *Turner,* 117 N. Y. 227, 233; *Lyon* v. *Manhattan Ry. Co.,* 142 N. Y. 298, 303; *People* v. *Cannon,* 139 N. Y. 32; *People* v. *Dunn,* 157 N. Y. 528; *People* v. *Ebelt,* 180 N. Y. 470; *Matter of Davies,* 168 N. Y. 89; *People* v. *Hall,* 169 N. Y. 184; *People* v. *Snedeker,* 160 N. Y. 350, 357; *People* v. *Petrea,* 92 N. Y. 143; *Walter* v. *People,* 32 N. Y. 147; *Hand* v. *Ballou,* 12 N. Y. 541; *Rexford* v. *Knight,* 11 N. Y. 308; *Perry* v. *Anderson,* 95 U. S. 628; *Mitchell* v. *Clark,* 110 U. S. 633.)

In *People* v. *Turner* (*supra,* p. 233) Chief Judge RUGER said: " The power of the legislature to change rules of evidence as they existed at the common law and to limit, change and vary existing rules for the limitation of actions, has been the subject of frequent consideration in the courts and has been uniformly held not to be affected or restricted by the constitutional limitations prohibiting the taking of life, liberty or property without due process of law."

The language of Judge EARL in *Board of Comrs. of Excise* v. *Merchant* (*supra,* p. 148) is more guarded and is a more exact exposition of the law: " The general power of the legislature to prescribe rules of evidence and methods of proof is undoubted. While the power has its constitutional limitations, it is not easy to define precisely what they are. A law which would practically shut out the evidence of the party and thus deny him the opportunity for a trial would substantially deprive him of due process of law. It would not be possible to uphold a law which made an action *prima facie* evidence of crime over which the party charged had no control and with which he had no connection, or which made that *prima facie* evidence of crime which had no relation to a criminal act and

no tendency whatever by itself to prove a criminal act. But so long as the legislature, in prescribing rules of evidence, in either civil or criminal cases, leaves a party a fair opportunity to make his defense and to submit all the facts to the jury to be weighed by them, upon evidence legitimately bearing upon them, it is difficult to perceive how its acts can be assailed upon constitutional grounds."

The Constitution protects rights, but leaves the control of remedies to the legislature, subject to the exception that it cannot deprive a party of all remedy whatever. The statute in question extinguished no right, but simply so regulated the procedure as to admit the evidence of a child under the age of twelve years, provided the court should be of the opinion that he did not understand the nature of an oath, but was possessed of sufficient intelligence to justify the reception of his statement. It limits the effect of such testimony by providing that no conviction can be founded upon it unless it is supported by other evidence. It permits the unsworn statement to be received for what it is worth, subject to the test of cross-examination. A child may not be able to understand the nature of an oath and yet be capable of telling what he saw and heard on a certain occasion with entire accuracy. It was to meet such a situation that the statute was passed, not to aid the prosecution only, but to aid the accused as well. The old saying that " fools and children always tell the truth " rests on the common observation of mankind that while such persons can tell what they saw and heard, they cannot invent a story and stick to it when closely questioned. Of course there are exceptions to that rule, but the persons coming within it would know enough to understand the nature of an oath, if it was explained to them, and could tell the same story whether sworn or not. The statute does not do away with oaths or affirmations generally, but only in a particular instance where the oath would be useless and yet the evidence might be valuable. At common law atheists

were incompetent as witnesses, yet they were made competent by statute, before the Constitution so provided. (2 R. S. 408.) Evidence as to pedigree is family hearsay, yet it is received from necessity because the members of past generations have passed away and cannot be sworn. Their statements are received without the sanction of an oath, because it is the best that can be done under the circumstances. So under other circumstances, where the witness cannot be sworn because he would not know what it meant, the legislature had the right to authorize, in the interest of what it considered to be justice, the unsworn statement of a young child to be received, leaving it to the jury to judge whether it was reliable or not, after weighing it with all the other evidence produced by either side. The defendant had a full opportunity to be heard in an orderly proceeding adapted to the nature of the case, to be confronted by the witnesses against him, with the right of cross-examination, and to prove any fact that would protect his liberty or his life. The statute abridged no constitutional right by so expanding the common law as to try to throw more light upon the subject under investigation than had previously been allowed, even if that light, in the judgment of some persons, is of doubtful value. When the legislature has power to act, the courts have no power to set their action aside.

The charge of the court, although not excepted to, is now criticized in two respects, one of which requires no comment, and the other is worthy only of the remark that the portion now objected to for the first time, if read by itself, would not state the law correctly, but when read in connection with what immediately preceded and followed, discloses no error. A charge must be considered as a whole and if when so read no error appears, none was committed, even if a detached portion when read by itself might mislead the jury. If a charge lacks clearness in any respect, it is the duty of counsel to remove the

doubt by a request for further instructions and if he fails to get them an exception will protect the rights of his client.

We find no error in the records, whether excepted to or not, that calls for a reversal of the judgment, which should, therefore, be affirmed.

CULLEN, Ch. J., O'BRIEN, HAIGHT, WERNER, WILLARD BARTLETT and HISCOCK, JJ., concur.

Judgment of conviction affirmed.