THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
REGINALD THOMPSON, Appellant.

Second Department, February 2, 1981

APPEARANCES OF COUNSEL

*William E. Hellerstein (Susan Manca* of counsel), for
appellant.

*Eugene Gold, District Attorney (Cynthia Kean* of coun-
sel), for respondent.

OPINION OF THE COURT

MARGETT, J.

The primary issue on this appeal is whether defendant's
right to a trial by an impartial jury, as defined by our
State Constitution, was violated by virtue of the prosecu-
tor's unquestioned use of all of the substantial number of
peremptory challenges exercised by him to exclude black

prospective jurors from the jury.[1] Since we conclude that, in the circumstances at bar, the Constitution of this State required the trial court to inquire into the prosecutor's reasons for the exercise of his peremptory challenges before denying defendant's motion for a mistrial based on the prosecutor's alleged misuse of those challenges, defendant's judgment of conviction must be reversed and a new trial ordered.

The defendant, who is black, was tried for the crimes of grand larceny in the second degree and criminal possession of stolen property in the first degree, arising out of the theft of an automobile. Since these crimes are class D felonies, the People and the defendant were each entitled to exercise 10 peremptory challenges[2] to prospective "regular" jurors (CPL 270.25, subd 2, par [c]). In addition, they were each entitled to four peremptory challenges with respect to the selection of the two alternate jurors to be chosen (CPL 270.25, subd 2, par [c]). After the trial jurors were selected and sworn, defendant's counsel moved for a mistrial on the ground that the Assistant District Attorney had unlawfully excluded blacks from the jury by using all[3] of the peremptory challenges exercised by him against prospective jurors who were black, with the result that all the jurors and alternates were white. Specifically, defense counsel stated:

"I would like to make a motion for a mistrial on [the] ground * * * that the District Attorney in the selection of the jury in this case has shown a systematic exclusion of Black people in his use of preliminary [sic] challenges by having ten challenges. He used the ten challenges for the ten Black people that were put into the jury. He didn't challenge anyone but Black people. And he even did the

---

1. This issue is one of first impression in the appellate courts of this State (but see *People v Kagan,* 101 Misc 2d 274; *People v McCray,* 104 Misc 2d 782).

2. CPL 270.25 (subd 1) provides: "A peremptory challenge is an objection to a prospective juror for which no reason need be assigned. Upon any peremptory challenge, the court must exclude the person challenged from service."

3. Although there is some ambiguity in the record, it appears that the prosecutor employed a total of 12 peremptory challenges, 10 with respect to prospective regular jurors and 2 with respect to prospective alternate jurors. In any event, it is undisputed that the prosecutor used all of his peremptory challenges, at least 10 in number, against blacks and that no blacks sat on defendant's jury.

same thing in the use of his alternate challenges. The result is that we have an all White jury, which I don't think is prejudicial, but I don't think the District Attorney had the right to use his challenges in a way to systematically exclude any racial group.

"I would point out that my client has shown great apprehension because of the nature and the way that the jury is being selected, that he is going to be given a fair trial by this jury.

"He feels that the District Attorney is trying to purposely select a jury that doesn't reflect any people of his racial background. I think that the record shows that the District Attorney did that, also."

In response, the Trial Judge noted, *inter alia*, that during the course of jury selection, he had indicated to the Assistant District Attorney his opinion, as a former trial lawyer, that several of the black veniremen peremptorily challenged by him "would have been fair and impartial and were of backgrounds that could have looked at the case fairly and impartially." However, because of his view that "the law is clear" that a prosecutor "has a right to * * * exercise peremptory challenges for whatever reasons he desires" the Trial Judge denied defendant's motion for a mistrial, declining to ask the Assistant District Attorney to state the reasons for the exercise of his peremptory challenges.[4] After defendant's motion was thus denied, the Assistant District Attorney volunteered that "[t]he District Attorney rejects the suggestion that the color of a juror necessarily determines the way in which he views evidence and finds the motion uncalled for." He also pointed out that the defendant had successfully challenged one black prospective juror for cause.

Thereafter, the jury[5] convicted defendant of criminal

4. From other remarks made by the Trial Judge during this colloquy, it may be inferred that he was not fully satisfied with this result. The Trial Judge stated that if the next case before him were to be tried by "one of the Assistants * * * who has acted in [sic] manner in the selection of a jury as [the Assistant District Attorney] did in this case" he would only accept the panel of prospective jurors if it contained a number of blacks in excess of the number of peremptory challenges available to the People.

5. When one juror failed to appear for the trial she was replaced by an alternate. No additional alternate juror was selected.

possession of stolen property in the first degree, the only charge that was submited to it.

When the defendant appeared for sentencing, his counsel moved to set aside the verdict on essentially the same ground on which he had based his motion for a mistrial.

In response to defendant's motion, the Assistant District Attorney argued, *inter alia*, that CPL 270.25 (subd 1) allowed peremptory challenges for which "no reason need be assigned" and that there was no constitutional impediment to such a practice under *Swain v Alabama* (380 US 202). The prosecutor concluded his argument by stating "the People may systematically and permissibly exclude members of a group and there is no reason for why."

The Trial Judge denied defendant's motion, but stated:

"If I had the right, if I were on this case, to make a finding of fact for you based upon my observation of the jury selection, I would say, and I must say that I would say that in this particular case, I would have found—I would find that—[the Assistant District Attorney] did in effect appear to the Court specifically and purposely to have excluded blacks in the jury. I would say it appeared to me that he did that with the regular panel, and my feeling for that was substantiated when we called for additional jurors and additional blacks were excluded in much the same manner that you described in your moving papers.

"I am constrained, however, to find that he has not violated existing law at this time by doing that, and if it is to be found that that is an improper method of selecting a jury, I think it has to be said by an Appellate Court or the legislature * * *

"We don't have a right at this time under our existing law to challenge or to question the exercise [*sic*] peremptory challenges by either party."

In response to the Trial Judge's remarks, the Assistant District Attorney stated, *inter alia*: "I will now state for the record, not that I have to, not that I am obliged to under the law, but that it was not my intent systematically to exclude blacks."

The Trial Judge then imposed sentence.

It is noted at this juncture that it appears that no record of the *voir dire* was made. However, it is undisputed that the prosecutor used all of the substantial number of peremptory challenges he employed in this case to exclude black veniremen and nowhere in the colloquy before the trial court or in the People's brief on appeal has the Assistant District Attorney articulated any reason why his peremptory challenges were so exercised. Indeed, it is the People's position that under the present state of the law, no reason need be given. Moreover, the People do not suggest that lack of a record of the *voir dire* deprives us of an adequate basis for review of defendant's claim. In addition, under our view of this case, the Trial Judge's perceptions of the prosecutor's conduct in selecting the jury, coupled with the undisputed fact that the prosecutor used all of his peremptory challenges against blacks and none against whites, serve to cure any deficiencies in the record that might have otherwise existed by virtue of the lack of a record of the *voir dire*. Accordingly, we address the merits of defendant's claim.[6]

In essence, defendant's claim is that the prosecutor's alleged use of his peremptory challenges for the purpose of excluding blacks from the jury solely because of their race, effectively deprived him of a right under the State Constitution to be tried by an impartial jury, one of the essential attributes of which is that it be selected from a fair cross section of the community. In response to defendant's claim, the People rely principally on *Swain v Alabama* (380 US 202, *supra*).

In *Swain*, *(supra)*, the State prosecutor used what were in effect peremptory challenges to exclude all six black prospective jurors from the jury that was to try the black defendant. The United States Supreme Court rejected defendant's claim that this action violated his rights under the equal protection clause of the Fourteenth Amendment to the Federal Constitution. After examining the "very old credentials" (p 212) of peremptory challenges and noting that they are often exercised "on grounds normally thought irrelevant to legal proceedings or official action, namely,

---

6. See *Commonwealth v Walker* (— Mass —, —, 397 NE2d 1105, 1107).

the race, religion, nationality, occupation or affiliations of people summoned for jury duty" (p 220), the Supreme Court concluded (p 222):[7] "In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it."

The People contend that "the rationale as well as the holding of *Swain* compels continued adherence to its rule", and rejection of defendant's claim. However, it is well settled that while due consideration should be given to the rationale of *Swain (supra)*, we are not bound by its holding as to the meaning of the Federal Constitution in interpreting the Constitution of our State. As the Court of Appeals has recently recognized, that court has "not hesitated when [it] concluded that the Federal Constitution as interpreted by the Supreme Court fell short of adequate protection for our citizens to rely upon the principle that that document defines the minimum level of individual rights and leaves the States free to provide greater rights for its citizens through its Constitution, statutes or rule-making authority" *(Cooper v Morin*, 49 NY2d 69, 79, cert den sub nom. *Lombard v Cooper*, 446 US 984). This is par-

---

7. Although the United States Supreme Court thus concluded that the Federal equal protection clause did not provide a basis for inquiry into the prosecutor's use of his peremptory challenges to exclude all black prospective jurors "in any given case", it indicated that a claim under that clause might be entertained when "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be", the prosecutor "is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries" *(Swain v Alabama* 380 US 202, 222, 223, *supra)*.

ticularly true in cases where the protections afforded by the Federal Constitution to persons prosecuted for crime have been found by the Court of Appeals to fall short of those mandated by our State Constitution (see *People v Elwell*, 50 NY2d 231, 235; *People v Isaacson*, 44 NY2d 511, 519-520; *People v Hobson*, 39 NY2d 479, 483-484; *People v Arthur*, 22 NY2d 325, 328-329). Moreover, there are other instances in which the Court of Appeals without specifically relying on the State Constitution, has determined that criminal defendants in New York are entitled to greater protections than those that are Federally mandated (compare *People v Huntley*, 15 NY2d 72, 78, with *Lego v Twomey*, 404 US 477, 489, and *People v Macerola*, 47 NY2d 257, 263, with *Cuyler v Sullivan*, 446 US 335, 342-350). Further, by terms of its Constitution or statutes not needful of judicial construction New York has, from one perspective, buttressed beyond Federal requirements the shield against "oppression by the Government" *(Duncan v Louisiana*, 391 US 145, 155) embodied in the jury by requiring that all jury trials of defendants charged with crimes prosecuted by indictment be tried by a jury of 12 (NY Const, art VI, § 18; see *People v Cosmo*, 205 NY 91, 99) and that jury verdicts in criminal cases be unanimous (CPL 310.80; cf. *Williams v Florida*, 399 US 78; *Johnson v Louisiana*, 406 US 356; *Apodaca v Oregon*, 406 US 404). Accordingly, although we accord due deference to the rationale of *Swain*, we are not bound by it in construing our State Constitution.

Moreover, *Swain v Alabama* (380 US 202, *supra)* involved only the construction of the equal protection clause of the Fourteenth Amendment and not the impartial jury guarantee of the Sixth Amendment, the Federal counterpart to the State Constitutional guarantee of an impartial jury involved in this case. The court in *Swain* was necessarily confined to considering only the equal protection issue since the decision in that case preceded the decision in *Duncan v Louisiana (supra)* by which the Sixth Amendment's guarantee of trial by jury was first held to be applicable to the States through the Fourteenth Amendment. It might well be that the question presented in *Swain* would be decided differently today by the United States Supreme

Court under the Sixth Amendment, particularly in light of that court's construction of that amendment in *Taylor v Louisiana* (419 US 522), more fully discussed below. However, in light of our analysis of the instant case, we need not resolve that question or defendant's related claim that other of his constitutional rights were also violated.[8]

We are also influenced to look beyond *Swain (supra)* in construing our State Constitution by decisions of the highest courts of California and Massachusetts in which those courts declined to follow the rationale of *Swain* in construing their own State constitutional guarantees of trial by jury and determining the effect of those provisions on the prosecutor's right to exercise peremptory challenges against black prospective jurors. In *People v Wheeler* (22 Cal 3d 258), the Supreme Court of California reversed convictions of two black defendants where no inquiry was made by the trial court into the prosecutor's reasons for his use of peremptory challenges to exclude blacks from the jury. Concluding that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross section of the community under article I, section 16, of the California Constitution" (pp 276-277),[9] the *Wheeler* court found reversible error in the failure of the trial court to have attempted to ascertain whether the prosecutor had been motivated solely by their perceived "group bias" in peremptorily challenging blacks where the defendants had made out a prima facie case that the prosecutor had been so motivated.[10] In *Commonwealth v Soares (—— Mass*

---

8. Since defendant does not raise the issue on appeal, we do not consider in this case whether defendant's rights under the equal protection clause were violated. We note, however, as the dissent implies, that permitting the prosecutor, the State's representative, to use peremptory challenges, without inquiry, in the face of circumstances which demonstrate a substantial likelihood that those challenges have been used to exclude persons from the jury solely because of their race, would also seem to raise a substantial issue under the equal protection clause of, at least, our State Constitution.

9. That provision provides in pertinent part that "Trial by jury is an inviolate right and shall be secured to all".

10. The record in *People v Wheeler* (22 Cal 3d 258) did not reveal the precise number of blacks excluded by the prosecutor by peremptory challenges. It appears that the prosecutor peremptorily challenged at least seven blacks, but also exercised some of his peremptory challenges against whites. The result was that the defendants were tried by an all-white jury.

———, 387 NE2d 499, 515, cert den 444 US 881) the Supreme Judicial Court of Massachusetts held that article XII of the Declaration of Rights of the Massachusetts Constitution[11] proscribes "the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community." Accordingly, the court held it was error for the trial court to have failed to inquire into the reasons for the prosecutor's use of peremptory challenges against blacks where the prosecutor used 12 of the 44 peremptory challenges exercised by him to exclude blacks, with the result that only one black, who was unchallenged, sat on the black defendants' jury. Inquiry was required because a prima facie case of impermissible exclusion solely because of race had been made out by the prosecutor's having peremptorily challenged 92% of the black prospective jurors, as opposed to 34% of the "available whites" (p ———, 517).

Similarly, in *State v Crespin* (94 NM 486), the Court of Appeals of New Mexico, an intermediate appellate court, "in effect * * * h[e]ld that improper, systematic exclusion [of blacks] by the use of peremptory challenges can be shown (1) under *Swain v State of Alabama, supra,* by presenting facts beyond the instant case; or (2) under the *Wheeler-Soares* rationale and supported by Article II, Section 14 of the New Mexico Constitution, where the absolute number of challenges in the one case raises the inference of systematic acts by the prosecutor."[12] Although the defendant's conviction was affirmed in *Crespin,* this was because the challenge of the one black member of the jury venire was held to be insufficient to raise the inference of the improper use of the peremptory challenge by the prosecutor. The *Crespin* court distinguished *People v Wheeler (supra)* and *Commonwealth v Soares (supra)* on the facts, since in those cases the prosecutor had exercised peremptory chal-

11. That provision provides in pertinent part that "no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."

12. That provision of the New Mexico Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall have the right to * * * trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

lenges against a substantially greater number of black prospective jurors.

As the foregoing indicates, the question at bar is whether peremptory challenges may be exercised by the prosecutor "without a reason stated, without inquiry and without being subject to the court's control" *(Swain v Alabama,* 380 US 202, 220, *supra)* so as to exclude blacks from the petit jury without running afoul of the constitutional rights of the defendant. Resolution of this issue requires an examination of the role of peremptory challenges in our criminal justice system and the nature of the constitutional right asserted by the defendant.

The Constitution of our State[13] secures the right of a criminal defendant to trial by an impartial jury (see *Stokes v People,* 53 NY 164). However, "the mode of procuring and impanneling [*sic*] such jury is regulated by law, either common or statutory, principally the latter, and it is within the power of the legislature to make, from time to time, such changes in the law as it may deem expedient, taking care to preserve the right of trial by an impartial jury" (p 173). The right to exercise peremptory challenges, unlike the right to exercise challenges for cause, is not an essential part of the mechanism for obtaining an impartial jury (see *People v Doran,* 246 NY 409, 426; *People v Lobel,* 298 NY 243, 257) and is not of constitutional dimension *(Walter v People,* 32 NY 147, 160). While *Walter* upheld the constitutionality of an 1858 statute which, for the first time, granted the People a statutory right to exercise peremptory challenges in a criminal case (see *People v McQuade,* 110 NY 284, 293), the court therein went on to observe (p 160) : "The subject of peremptory challenge has always been under legislative control, and it is only within a comparatively recent period, that the right has been extended even to the accused, in a minor class of criminal offenses. Even if it were a right given by common

---

13. Section 1 of article I of the New York Constitution provides in pertinent part: "No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers". The constitutional guarantee of an impartial jury is reflected in and made explicit by section 12 of article 2 of the Civil Rights Law, which provides in pertinent part: "In all criminal prosecutions, the accused has a right to a * * * trial, by an impartial jury".

law, it could be restrained, limited or withheld altogether at the legislative will."

As suggested by *Walter (supra)* the history of the peremptory challenge in this State reflects that it is merely a creature of statute which may be "limited or withheld altogether". Indeed, for 81 years following the establishment of New York's first Constitution, the People had no express statutory right to exercise challenges of a peremptory nature, while the accused could exercise such challenges only when charged with the most serious crimes. For 96 years the People were entitled to substantially fewer peremptory challenges than was the accused.[14]

By its first Constitution, New York, with a few irrelevant exceptions, adopted as its law the law of the colony of New York as it existed at the time of the revolution (NY Const of 1777, § 35; see *People v Henries*, 1 Parker Cr Rep 579, 580). With respect to peremptory challenges, the law so adopted consisted of the common law of England as modified by the Ordinance for Inquests (33 Edw 1, Stat 4) in 1305. Under the common law as it existed before 1305, the prosecutor, in all felony trials, was entitled to exercise an unlimited number of peremptory challenges, while the accused was entitled to exercise 35.[15] Apparently, neither side was permitted peremptory challenges in trials for lesser crimes (see *Swain v Alabama*, 380 US 202, 212-213, *supra*). The Ordinance for Inquests, by its terms, appeared to terminate the prosecutor's right to exercise any peremptory challenges by requiring that if "they that sue for the King will challenge any * * * Jurors, they shall assign * * * a Cause certain." However, the apparent intended effect of that Ordinance was evaded by judicial constructions thereof which permitted the prosecutor the unfettered right, without stating a reason, to have an unlimited number of prospective jurors "stand aside" until the remainder of the panel of prospective jurors had been exhausted. Only if a

---

14. This history is consistent with the initial development of the peremptory challenge as a device to protect the defendant against jurors who appeared to be prejudiced against him (see 4 Blackstone's Comm [Cooley ed], p 353).

15. In 1530 the number of peremptory challenges to which the accused was entitled was reduced from 35 to 20 in all felony cases except those involving high treason (Van Dyke, Jury Selection Procedures, pp 147-148).

jury of requisite size had not then been selected was the prosecutor required to assign a cause for the disqualification of the prospective jurors whom he had requested to "stand aside". This procedure has apparently continued to this day in England, without abatement (see *Swain v Alabama, supra*, p 213, n 12).

In contrast to the English experience, within nine years of the enactment of its first Constitution, New York enacted a statute which effectively abolished the People's right to have prospective jurors "stand aside", by requiring the prosecutor to "immediately" assign a cause for the disqualification of each prospective juror whom he proposed to have excluded from the trial jury (Act of April 19, 1786, § 22, L 1786, ch 41). Thus, this statute terminated the prosecutor's right to effectively challenge prospective jurors peremptorily (see *People v Henries, supra*, p 580; *People v Aichinson*, 7 How Prac 241, 242-243). By statute enacted in 1828, the Legislature expressly granted the accused 20 peremptory challenges in trials for crimes punishable by death or 10 or more years' imprisonment, without granting the People any peremptory challenges in such cases (2 Rev Stat [1829], part IV, ch II, tit V, § 9). It was not until 1858 that the People were expressly granted peremptory challenges by statute.[16] In that year, the People were granted five peremptory challenges in trials for crimes punishable by death or 10 or more years' imprisonment (L 1858, ch 332), but no change was made in the provision entitling the accused to 20 peremptory challenges in such

---

16. The Act of April 27, 1847 (L 1847, ch 134) did not expressly grant the People the right to exercise peremptory challenges in criminal cases. However, two courts, reading it *in pari materia* with a 1787 statute authorizing two peremptory challenges for each party in civil actions, construed that statute as granting the People the right to exercise up to two peremptory challenges in trials for criminal negligence *(Waterford & Whitehall Turnpike Co. v People*, 9 Barb 161) and burglary in the third degree *(People v Caniff*, 2 Parker Cr Rep 586). However, the import of the statutory provisions relied on in those cases was sufficiently unclear to permit an equal number of courts to disagree with those decisions and conclude that the 1847 enactment had not entitled the People to any peremptory challenges in criminal cases, even in trials for murder *(People v Aichinson*, 7 How Prac 241, *supra; People v Henries*, 1 Parker Cr, Rep 579, *supra)*. The implication of the Court of Appeals discussion of the history of the peremptory challenge in New York in *People v McQuade* (110 NY 284, 293, *supra)* is that *Aichinson* and *Henries* were correctly decided.

cases. Under the 1858 statute, the People were granted three peremptory challenges in trials for lesser crimes, while the accused was granted five. It was not until the enactment of chapter 427 of the Laws of 1873 that the People became entitled, as they are today, to the same number of peremptory challenges as the accused on the trial of all felonies and misdemeanors (see *People v McQuade*, 110 NY 284, 293, *supra*).

Although in New York the right of the accused to exercise peremptory challenges is more longstanding than that of the People, and has apparently never been "withheld altogther" in trials for the most serious crimes, it has not been unlimited. Thus, a statutory provision requiring codefendants to join in the making of peremptory challenges is constitutional and permits a defendant to be convicted by a jury containing jurors as to whom he alone has attempted to assert a peremptory challenge *(People v Lobel*, 298 NY 243, 257, *supra;* see CPL 270.25, subd 3).

It is against this background that we examine the constitutional right asserted by defendant and its implications for the peremptory challenge as it was employed in this case. A line of United States Supreme Court cases has recognized the principle that an essential element of the Federal guarantee of an impartial jury is that the jury is drawn from a representative cross section of the community. "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community" *(Smith v Texas*, 311 US 128, 130). "Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted" *(Glasser v United States*, 315 US 60, 86). "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community" *(Thiel v Southern Pacific Co.*, 328 US 217, 220; see, also, *Ballard v United States*, 329 US 187; *Peters v Kiff*, 407 US 493; *People v Wheeler*, 22 Cal 3d 258, *supra*).

The most recent case in this line is *Taylor v Louisiana*

(419 US 522, 530, *supra)* which held that a criminal defendant in a State court has a right under the Sixth and Fourteenth Amendments to the Federal Constitution to have his jury "chosen from a fair cross section of the community". *Taylor* involved a State law which provided that a woman was not to be selected for jury service unless she had previously filed a written declaration of her desire to be subject thereto. The effect of this provision was the virtual exclusion of women from jury venires. In Taylor's case, no women were in the venire and, presumably no women served on the petit jury. Taylor was convicted after his motion to quash the venire had been denied. The United States Supreme Court reversed his conviction, determining that (p 526) "the presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions."

The fundamental principle of *Taylor (supra)* has been recognized not only by the courts of this State *(People v Parks,* 41 NY2d 36), but also by the Legislature. In an effort to ensure that jury selection procedures "meet all constitutional requirements that juries represent a fair cross-section of the community" and to "promote greater citizen participation in the civil and criminal jury system" (NY Legis Ann, 1977, p 148), the Legislature enacted article 16 of the Judiciary Law, effective January 1, 1978, which, *inter alia,* eliminates or modernizes certain grounds for exemption and disqualification and makes the following declaration of policy: "It is the policy of this state that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the county or other governmental subdivision wherein the court convenes" (Judiciary Law, § 500).

Since *Taylor (supra)* defines, at least, the minimal rights to be afforded our citizens in an intimately related area of the law (see *Cooper v Morin,* 49 NY2d 69, 79, cert den *sub nom. Lombard v Cooper,* 446 US 984, *supra),* we adopt its principles as a guide in construing our State Constitution and applying it to the case at bar.

Although *Taylor* (*supra*) was directly concerned with the manner of selection of veniremen, rather than petit jurors, we believe that its principles are equally applicable to the selection of petit jurors since the court's rationale was largely derived from a recognition that the vice of exclusion of cognizable groups from jury venires is that such exclusion necessarily results in the absence of members of such groups from petit juries, with grave consequences both for the petit jury's capacity to serve as a guard against governmental oppression and for the public's perception of the fairness of the jury system.

"We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the common sense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. *Duncan v. Louisiana*, 391 U. S., at 155-156. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

" 'Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . . [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' *Thiel v. Southern Pacific Co.*, 328 U. S. 217, 227 (1946) (Frankfurter, J., dissenting)" *(Taylor v Louisiana*, 419 US 522, 530-531, *supra)*.

The importance of "the assurance of a diffused impartiality" in addition to the assurance of impartiality on the

part of individual jurors is also made apparent by the plurality opinion of Mr. Justice MARSHALL in *Peters v Kiff* (407 US 493, *supra*). In *Peters*, a white defendant's conviction in State court was reversed where the defendant, who alleged that blacks had been systematically excluded from the Grand Jury that had indicted him and the jury that had convicted him, had been denied an opportunity to prove his allegations. In the course of his opinion, which concluded that such an exclusion would amount to a violation of the due process clause of the Fourteenth Amendment,[17] Mr. Justice MARSHALL stated (pp 503-504) : "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."

Moreover, recognition of the importance of the assurance of "diffused impartiality" may be required by the very language of our State Constitution, which mandates that no person shall be deprived of rights "unless by the law of the land, or *the judgment of his peers*" (NY Const, art I, § 1; emphasis added). Exclusion of prospective jurors from the jury in a criminal case solely because of their race would appear to be inconsistent with this mandate, particularly where the defendant is of the same race as the excluded jurors.

In light of both the text of our Constitution and the recognition basic to the decisions in *Taylor (supra)* and *Peters (supra)* that the guarantees of the constitutional provisions ensuring impartial juries and due process are fully achieved only when the petit jury is not unnecessarily deprived of the perspectives of the members of any race or sex, we cannot confine the application of the principles of those cases to the selection of venires. Simply put, with respect

---

17. Since the trial in *Peters v Kiff* (407 US 493, *supra*) was conducted before the decision in *Duncan v Louisiana* (391 US 145, *supra*) the Sixth Amendment was unavailable as a basis of relief for the defendant.

to postindictment proceedings, the end result sought to be achieved by the fair cross-section requirement of *Taylor* is not merely the impanelment of venires that reflect a fair cross section of the community. Venires do not hear evidence, deliberate or determine a defendant's guilt. Indeed, in our view, the primary significance of the impanelment of a venire that reflects a fair cross section of the community is that, without it, there is virtually no possibility that the "diffused impartiality" found to be an element of an "impartial jury" in *Taylor* will operate and the participation of diverse groups in the criminal justice system will occur at the crucial trial level.

In this latter regard, we view service as jurors by members of all racial groups to the fullest extent possible, an end promoted by the fair cross-section requirement, to be of no less importance than the achievement of "diffused impartiality", since such participation fosters the confidence of the parties and the public in our criminal justice system. Under the circumstances of this case, even if it could somehow be determined that the jurors who rendered the verdict were, in fact, individually impartial, "that would not dispel the lingering appearance of justice denied" *(People v Culhane*, 33 NY2d 90, 103) in light of the fact that no inquiry was made into the prosecutor's reasons for his use of peremptory challenges. (Cf. *People v Shinkle*, 51 NY2d 417.)

Moreover, in the context of this case, it does not appear that the interests underlying the fair cross-section requirement would conflict with the fundamental guarantee of a jury composed of jurors who are individually impartial if those interests were to be effectuated at the petit jury level. Put another way, we cannot conclude that depriving the prosecutor of the socially divisive tactic of excluding petit jurors solely because of their race will result in juries that are less impartial than juries that would be selected after giving this tactic full rein. With respect to individual jurors, we are not convinced that race, and race alone, will influence a juror to consider evidence in a partial manner, regardless of such characteristics as the juror's economic, social, educational and philosophical background, to such a degree that nullification of the principle of diffused im-

partiality and the societal interest in the promotion of the participation of the members of all races at all levels of the criminal justice system is warranted. Moreover, even assuming that race alone is a powerful determiner of the manner in which a juror considers evidence, we agree with the court in *Commonwealth v Soares* (—— Mass ——, 387 NE2d 499, *supra)* that viewing the jury as a whole, permitting the unencumbered exercise of peremptory challenges does anything but ensure the selection of an impartial jury. As that court stated (p 516): "Given an unencumbered right to exercise peremptory challenges, one might expect each party to attempt to eliminate members of those groups which are predisposed toward the opposition. However, when the defendant is a minority member, his attempt is doomed to failure. The party identified with the majority can altogether eliminate the minority from the jury, while the defendant is powerless to exclude majority members since their number exceeds that of the peremptory challenges available. The result is a jury in which the subtle group biases of the majority are permitted to operate, while those of the minority have been silenced."

Our recognition of the importance of the principle of "diffused impartiality" and the participation of all members of all racial groups at all stages of the trial process does not require that petit juries reflect the racial composition of the community or that any or all juries must contain any number of blacks or whites. Contrary to the suggestion of our dissenting brothers Justices MANGANO and TITONE we, like the court in *Taylor*, decline to impose any requirement that "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population" *(Taylor v Louisiana,* 419 US 522, 538, *supra).* For one thing, such a requirement would be almost impossible to meet without great administrative difficulty and a potential for abuse that would outweigh any ameliorative effect that such a requirement might have. Since venires and jury panels are properly selected at random (see Judiciary Law, § 507), it is inevitable that some panels will include few or no blacks. To require panels to precisely reflect the racial composition of the community would be unworkable, involve the selection of individuals

by court officials, with potential for abuse, and create the appearance of partiality. Moreover, after the panel is selected, prospective jurors who may be disqualified "for cause" on the grounds set forth in CPL 270.20 must be excluded from the jury, regardless of their race (see *People v Lobel*, 298 NY 243, 257, *supra; People v Doran*, 246 NY 409, 427, *supra*).

Accordingly, we recognize that the vagaries of random draw, which are beyond our influence, and the necessity of permitting challenges for cause, which is of constitutional dimension, will often prevent the jury from being composed of members who reflect a cross section of the community. Still, devices or procedures which are not beyond the control of courts and are not constitutionally mandated must be examined carefully to determine the extent to which they may lawfully coexist with the defendant's constitutional right to trial by a jury drawn from a fair cross section of the community. We thus examine the peremptory challenge.

It is apparent that the unfettered use of the peremptory challenge on the basis of race may, in and of itself, ultimately defeat the defendant's right to trial by a jury drawn from a fair cross section of the community, even though the venire and panel may have been selected in a manner consistent with that right. On the other hand, the peremptory challenge, although not of constitutional dimension, plays the salutary role of providing a basis for the exclusion of a prospective juror who, as a result of circumstances relating to the particular case, the parties, or the witnesses, is not impartial, or who is perceived by a party in good faith not to be impartial or to be less impartial than other prospective jurors, but whose lack of impartiality cannot be established by conventional proof to justify a disqualification for cause. The peremptory challenge is also a device for excluding a juror whose lack of impartiality cannot be established without causing embarrassment to the challenged juror and resentment of the challenging party among remaining jurors (see *People v Wheeler*, 22 Cal 3d 258, *supra*).

When employed in these ways, the peremptory challenge

is akin to the challenge for cause in that it serves to exclude prospective jurors of questionable impartiality, on the basis of circumstances peculiar to the case on trial. Moreover, the preservation of the peremptory challenge in some form is almost essential to the effective use of the challenge for cause. This is so since it permits a party to vigorously question a prospective juror to establish grounds for the juror's disqualification for cause safe in the knowledge that, if the party's application to challenge for cause is denied, the party may challenge the juror peremptorily, obviating the necessity of the party attempting to accomplish the difficult task of establishing that his questioning has so affected the juror's state of mind as to have rendered him incapable of rendering an impartial verdict and thus excludable for cause. Therefore, to the extent that it does not infringe upon the right to trial by a jury drawn from a fair cross section of the community, the peremptory challenge should be preserved in its fullest measure (see *Stokes v People*, 53 NY 164, 173, *supra*).

We reconcile all these competing considerations by holding that our Constitution requires that petit juries be selected in a manner that permits the exclusion of blacks only by means of either random selection or the challenging of prospective jurors, on the basis of actual or perceived partiality, which relates not to race alone, but to the particular case on trial or the parties or witnesses thereto, by the use of the challenge for cause or the peremptory challenge. Put another way, a peremptory challenge may not be employed to exclude a prospective juror solely because of his race.[18]

---

18. Even the court in *Swain v Alabama* (380 US 202, *supra*) appeared to accept the proposition that, under some circumstances, a defendant may establish unconstitutional use of peremptory challenges by showing that such challenges had been used to exclude black prospective jurors solely because of their race (see n 7, *supra*). However, that court held, in effect, that a defendant who offered proof of the prosecutor's conduct in his case alone could never overcome the presumption of constitutional use of peremptory challenges. To do so, he would also have to offer proof of a prior pattern and practice of discrimination. We agree with the court in *People v Wheeler* (22 Cal 3d 258, *supra*) that a defendant who claims to have been the victim of racial discrimination in the use of peremptory challenges should not be conclusively barred from attempting to prove that fact merely because he has been one of

We agree, in essence, with the courts in *People v Wheeler* (22 Cal 3d 258, *supra*) and *Commonwealth v Soares* (— Mass —, 387 NE2d 499, *supra*) with respect to the procedure to be followed in an effort to guarantee that prospective jurors are not excluded by peremptory challenges because of their race. Because of the important role of the peremptory

---

the first defendants who have apparently been subjected to that kind of discrimination. We also agree with that court that even a defendant whose trial was conducted after a pattern and practice of discrimination had apparently occurred would inevitably fail in trying to prove the existence of such a pattern and practice. The California court's discussion in this regard is equally applicable to New York.

"Under *Swain* a defendant is barred from vindicating his right to an impartial jury unless he can prove that over a long period of time the same prosecutor has struck every black from every petit jury 'whatever the circumstances, whatever the crime and whoever the defendant or the victim may be.'

"To begin with, *Swain* obviously furnishes no protection whatever to the first defendant who suffers such discrimination in any given court—or indeed to all his successors, until 'enough' such instances have accumulated to show a pattern of prosecutorial abuse. Yet in California each and every defendant— not merely the last in this artificial sequence—is constitutionally entitled to trial by a jury drawn from a representative cross-section of the community.

"Moreover, even if we consider only the defendant who believes himself in a position to invoke the exception suggested in *Swain*, we see that his attempt to comply with the federal standard of proof is bound to fail. The defendant is party to only one criminal proceeding, and has no personal experience of racial discrimination in the other trials held in that court. Nor can he easily obtain such information, for several reasons. First, those defendants who are indigent or of limited means cannot afford to pay investigators to develop the necessary data. Second, even if the funds were available—or the public defender's office were willing and able to do the research—the time is not: by definition, abuse of peremptory challenges does not appear until the jury selection process is well under way—as in the case at bar—and few if any trial judges would be willing to interrupt the proceedings at that point by a continuance of unpredictable length to permit the necessary investigation. Third, even if the funds and time were available, the data is not: we know of no central register conveniently listing the names and races of all jurors peremptorily challenged by the prosecution in a given court.

"Rather, the defendant would be required to somehow obtain and analyze the records of an undetermined number of individual trials in the hope of finding a pattern of abuse among the many peremptory challenges there exercised by the People. But he would have no practical way of discovering which of the excused jurors were black, or of proving their race even if he could learn of it; nor, for the same reasons, could he discover and prove the race of each of the previous defendants and their victims. And even if he could somehow show such a pattern at the hands of certain prosecutors, what of other prosecutors who had more recently joined the local district attorney's office? Would they be immunized from any inquiry until they had made a 'record' of such discrimination? If so, how many 'free' unrepresentative juries would each be entitled to?" *(People v Wheeler*, 22 Cal 3d, at pp 285-286.)

challenge, the societal interest in the efficient conduct of trials, and the respect which we and other courts hold for counsel as officers of the court, the initial presumption in a case such as this one should be that the prosecutor's use of peremptory challenges is constitutionally proper. If, as jury selection proceeds, the defendant believes that the prosecutor's use of peremptory challenges is constitutionally improper, he must raise the issue[19] in a timely manner at the risk of waiver, and make as complete a record in support of his claim as is possible. Of course, this and all subsequent parts of the procedure outlined herein should be conducted out of the presence of jurors and prospective jurors.

To rebut the initial presumption, the defendant must establish that the persons challenged are members of a racial group and that, from all the circumstances, there is a substantial likelihood that such persons are being or have been challenged solely because of their race, rather than because of any specific bias related to the circumstances of the case, the parties or the witnesses. The types of evidences listed in *People v Wheeler* (*supra*, pp 280-281) are all relevant in this regard. In the face of defendant's showing, the Trial Judge

---

19. Since the ultimate relief available to defendant as a result of his having raised the issue includes the commencement anew of the jury selection process, and, thus, the trial (see CPL 1.20, subd 11) because of conduct which has deprived him of a fair trial, the appropriate manner for defendant to raise the issue is by a motion for a mistrial (see CPL 280.10), the procedure followed by defendant at bar.

We note that since jeopardy does not attach until the entire jury has been impaneled and sworn (see CPL 40.30, subd 1, par [b]; *Matter of Brackley v Donnelly*, 53 AD2d 849; *Crist v Bretz*, 437 US 28), and the defendant's motion for a mistrial must be made in a timely manner, the double jeopardy clause will rarely be implicated in those cases where the defendant's motion is granted and the trial begun anew. Moreover, even where a motion of this kind is entertained and granted after the jury has been impaneled and sworn, the double jeopardy clause would prohibit the trial from being begun anew only in the unusual circumstances where the prosecutor's " 'bad-faith conduct' * * * threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' " (*Lee v United States*, 432 US 23, 33, quoting from *United States v Dinitz*, 424 US 600, 611). The prosecutor's mere misuse of his peremptory challenges, at a time when no evidence has been adduced, would not amount to such conduct.

Finally, it is clear that defendant in the case at bar may be retried since, among other things, his first trial proceeded to a guilty verdict (see *People v Key*, 45 NY2d 111, 120; *United States v Ball*, 163 US 662).

must determine whether there is a substantial likelihood that peremptory challenges are being used on the ground of race alone. If it is determined that such a likelihood does not exist, then no inquiry of the prosecutor may be made. However, if it is determined that such a likelihood does exist, then, and only then, does the burden shift to the prosecutor to show, in response to inquiry by the trial court, that the peremptory challenges in question were not exercised solely on the basis of the prospective juror's race.[20] To carry this burden, the prosecutor need not show that his reasons for the exercise of the challenges in question "rise to the level of a challenge for cause" (*People v Wheeler, supra,* p 282). However, it must be shown that the exercise of such challenges was based on grounds that were related to the characteristics of the prospective juror apart from his race, the particular case on trial, or the parties or witnesses thereto. We expect that the determination whether there has been such a showing may ordinarily be made solely on the basis of the trial court's observation of the jury selection procedure, the prosecutor's explanation of the reasons for the use of his challenges, and argument of counsel. Only in the unusual case, if at all, would it appear that a hearing would be necessary. If, upon inquiry and due consideration, the trial court determines that the prosecutor has not borne his burden, then "the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a dif-

---

20. At this juncture, the statutory provision set forth in CPL 270.25 (subd 1) that "no reason need be assigned" for the exercise of a peremptory challenge must, of course, yield to the defendant's constitutional right to be tried by an impartial jury selected from a fair cross section of the community (see *Stokes v People,* 53 NY 164, 183, *supra; Walter v People,* 32 NY 147, 160, *supra; Swain v Alabama,* 380 US 202, 244-245, *supra* [dissenting opn, GOLDBERG, J.]). While this provision is not unconstitutional on its face, it is unconstitutional as applied in cases such as this one where, in the face of circumstances establishing a substantial likelihood that peremptory challenges have been used in an unconstitutional manner, it bars the inquiry necessary to determine if that is in fact the case (see *People v Wheeler, supra,* p 281, n 28).

ferent venire shall be drawn and the jury selection process may begin anew." (*People v Wheeler, supra,* p 282.)

Applying these principles to the case at bar, we conclude that, from all the circumstances, including the prosecutor's use against blacks of all of his many peremptory challenges, the defendant's race, and the Trial Judge's perceptions of both the characteristics of the prospective jurors who were challenged peremptorily and the conduct of the prosecutor, there was a substantial likelihood that the challenges in question were based solely on race. It must be noted that it is these perceptions of the Trial Judge, made during the course of the jury selection procedure, which, more than anything else, compel this conclusion, for reasons which merit some discussion.

The determination of whether a defendant has met his initial burden of showing that there is a substantial likelihood that peremptory challenges have been exercised solely on the basis of race is a difficult one for a Trial Judge to make, even where the Trial Judge has keenly observed all aspects of the jury selection procedure. However, it is even more difficult for appellate courts to review such determinations because, by their nature, they rest to a peculiarly substantial degree upon the Trial Judge's personal observation of the *voir dire* proceedings, including the conduct of the attorneys and the demeanor and behavior of the potential jurors. For example, a black juror may have been peremptorily challenged, and properly so, because of some idiosyncrasy which does not appear on the cold record, but which was apparent to anyone who was intently observing the conduct of the *voir dire.* Accordingly, in reviewing such determinations, even greater deference than usual must be paid to the finder of fact. In this regard, we part company with the courts in *People v Wheeler* (22 Cal 3d 258, *supra*), *Commonwealth v Soares* ( — Mass —, 387 NE2d. 499, *supra*)[21] and *State v Crespin* (94 NM 486, *supra*) to the ex-

---

21. But see *Commonwealth v Walker* (— Mass —, —, 397 NE2d 1105, 1108, *supra*) where, in affirming a black defendant's conviction, although the trial court had apparently declined to inquire into the prosecutor's reasons for the exercise of his peremptory challenges, the appellate court stated: "We think we should not substitute our judgment for that of the trial judge on the record

tent that they suggest that a defendant may compel inquiry into the reasons for a prosecutor's use of peremptory challenges merely because the prosecutor has used a particular number of his peremptory challenges to exclude black potential jurors, for it may well be that the prosecutor's peremptory challenges were properly exercised, but for reasons that are not as readily apparent to those who were not in the position of the Judge who attended the *voir dire*. Thus, while exclusion of a significant number of black potential jurors will usually be part of the case of a defendant who seeks to have the trial court inquire into the prosecutor's use of peremptory challenges based upon alleged exclusion of blacks, such exclusion will be insufficient, in and of itself, to warrant reversal of a trial court's determination not to make inquiry.

Since, in this case, there was a substantial likelihood that the prosecutor had used his peremptory challenges solely on the basis of race, the trial court erred in failing to inquire into the prosecutor's reasons for the exercise of his peremptory challenges before denying defendant's motion for a mistrial. This error requires reversal of defendant's conviction, without regard to the quantum or quality of the proof of his guilt (see *People v Crimmins*, 36 NY2d 230, 238).[22]

---

before us. Peremptory challenges in the present case of five out of seven blacks, or of six out of eight, obviously present a less compelling showing than challenges of twelve out of thirteen in the *Soares* case."

22. Even were we to consider remanding this case to the Trial Judge to now make the inquiry and follow the procedure mandated by this decision, with its attendant difficulties of reconstruction, we note that the People concede that this is not feasible since the Assistant District Attorney who prosecuted the case is no longer "available".

It is also appropriate to note at this point that the difficulties of reconstruction, the initial presumption of constitutionally proper use of peremptory challenges, and the substantial degree of deference owed to a trial court's decision that defendant has failed to demonstrate a substantial likelihood of constitutionally improper use of such challenges will, under most circumstances, combine to doom to failure the defendant who attempts to raise the kind of issue we address here, without having made a contemporaneous record at the *voir dire* of the circumstances underlying his claim. This record should include a transcript of the *voir dire* proceedings at least from the time that the defendant has reason to suspect that the prosecutor is using his peremptory challenges in an unconstitutional manner. Although the *voir dire* was not transcribed at bar, the undisputed facts in the record, coupled with the Trial Judge's stated "findings" based on his observation of the conduct of the *voir dire*,

MANGANO, J. (dissenting). The majority has narrowly defined the issue presented herein. It is not whether defendant's rights under the due process or equal protection clauses of the Fourteenth Amendment to the United States' Constitution have been violated. It is not whether his right to a fair trial under the Sixth Amendment to the United States Constitution has been violated. The only question confronting the court is whether there has been a violation of defendant's State constitutional right to a trial by an impartial jury.

The majority holds that this State constitutional right was infringed. It finds that the trial court erred in not inquiring into allegations that the prosecutor acted out of racial prejudice in excluding, by peremptory challenge, members of defendant's race from service on the petit jury.

In reaching this conclusion, the majority acknowledges the United States Supreme Court's opinion in *Swain v Alabama* (380 US 202) as a landmark decision in this area of the law. Nevertheless, it recognizes no precedential or persuasive value in *Swain*, which analyzed a criminal defendant's right to an impartial jury in terms of Federal constitutional guarantees of equal protection. Instead, the majority decides to resolve this State constitutional question by analogizing to, and extending, the principles announced by the United States Supreme Court in *Taylor v Louisiana* (419 US 522). *Taylor* dealt with a criminal defendant's right to an impartial jury under the Sixth Amendment to the United States Constitution.

In adopting and applying the *Taylor* holding to the case at bar, the majority also decides to follow the opinions of the Supreme Court of California in *People v Wheeler* (22 Cal 3d 258) and the Supreme Judicial Court of Massachu-

---

make it apparent that it was error for the Trial Judge to have failed to inquire into the reasons for the prosecutor's use of his peremptory challenges in this case.

We add that the difficulty of reconstructing jury selection procedures, particularly as they relate to the particular manner in which peremptory challenges were employed, and other factors, such as the undoubted extensive reliance by prosecutors on the heretofore statutory inviolability of the peremptory challenge, militate against retroactive application of our decision in this case (see *People v Wheeler, supra,* p 283, n 31; *Daniel v Louisiana,* 420 US 31).

setts in *Commonwealth v Soares* ( — Mass —, 387 NE2d 499). Both of these cases were decided on State constitutional grounds.

The majority here, and in *People v Wheeler (supra)* and *Commonwealth v Soares (supra)*, understands the constitutional right to an impartial jury to be coextensive with a defendant's opportunity to have a jury chosen from a fair cross section of the community. The majority is cognizant that the vagaries of the random draw and the necessity of permitting challenges for cause will often prevent a jury's composition from reflecting such a fair cross section of the community. Nevertheless, it holds that if the State, by use of the peremptory challenge and for reasons of racial prejudice alone, prevents members of a particular racial group from serving on a petit jury, that jury's impartiality is per se violated. Thus, each petit jury, to be impartial, must reflect a fair cross section of the community, as represented in the venire, unless the random draw and challenges for cause make that impossible.

This conclusion is drawn by specifically adopting the principles of *Taylor v Louisiana (supra)* and applying them to the case at bar. *Taylor's* rationale is therefore extended to cover the selection of petit jurors, as well as veniremen. This is done, notwithstanding the express language in *Taylor* repudiating such an extension (p 538): "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition * * * but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." According to *Taylor*, then, a petit jury's impartiality, though never defined, is not equated with a fair cross section of the community. Impartiality is a concept separate and distinct, and, when applied to a petit jury, is determined independently from the jury's racial, ethnic, religious or national makeup. It is achieved when litigants are assured that "the jurors before

whom they [will] try [their] case will decide on the basis of the evidence placed before them, and not otherwise" *(Swain v Alabama,* 380 US 202, 219, *supra)*.

I cannot, therefore, adhere to the majority's view of the impartiality of petit juries, nor to its extension of the *Taylor* rule. And yet, I concur in its concern over allegations that persons are being excluded by the State from service on petit juries simply out of racial bias. This certainly violates the equal protection rights of those prospective jurors, and, in some indefinable way, reduces the appearance of justice in our criminal justice system. Such a practice should not be countenanced. I am not convinced, however, that in this forum lies the remedy.

By today's decision, the majority, in effect, rewrites CPL 270.25. Without expressly construing or interpreting the statute, it changes the definition of a peremptory challenge, which is written in plain language. No longer is a peremptory challenge "an objection to a prospective juror for which no reason need be assigned" (CPL 270.25, subd 1). Instead, it is an objection for which no reason need be assigned, unless there is a substantial likelihood of sustaining an allegation that the prosecutor has used his peremptory challenges solely on the basis of race. Moreover, this allegation must be made against the State, thus circumscribing the definition of the peremptory challenge as it applies to the State alone.

The State's exercise of the otherwise limitless right of the peremptory challenge is limited so as to change the very essence and nature of this right. Nonetheless, the majority does not admit to this change, which, in reality, invalidates the statute as written. It contends, however, that the statute is only invalidated when it is applied unconstitutionally. But this is not true. The statute will be invalidated whenever there is a substantial likelihood that unconstitutional misconduct has occurred, whether ultimately proven or not. Consequently, the State, in order to exercise its statutory right to an unfettered use of the peremptory challenge will have to forego that right whenever it is accused of misusing it as a tool of racial discrimination, and whenever such an accusation impresses the trial court as having a substantial

likelihood of being true. Thus, by an indefinite standard, depending too heavily on the perceptions of individual Trial Judges, inquiry will be authorized into the State's use of peremptory challenges, logically requiring a sufficient response in order to defeat any allegation of misconduct. Such a test is vague and uncertain "and severely limits the scope of peremptory challenges. If peremptory strikes can only be exercised in a certain way, dependent on circumstances, and subject to judicial scrutiny, they will no longer be peremptory * * * [A]n alteration of the very nature of the peremptory system [will occur.]" *(State v Grady,* 93 Wis 2d 1, 13; see *People v Fleming,* 91 Ill App 3d 99, 105; Ann. Use of Peremptory Challenge, 79 ALR3d 14, 27-42.)

The majority has thus confronted an admittedly difficult problem and attempted to resolve it by well-meaning judicial legislation. I find this to be a precarious step, fraught with dangerous consequences for the efficient administration of criminal justice. If this step is to be taken, it is the Legislature's to take since that branch of government has the means of making balanced adjustments to the law as a whole (see *Bright Homes v Wright,* 8 NY2d 157, 162; *Austin v Board of Higher Educ. of City of N. Y.,* 5 NY2d 430, 444).

Accordingly, I dissent and vote to affirm.

HOPKINS, J. P., and GIBBONS, J., concur with MARGETT, J.; MANGANO, J., dissents and votes to affirm the judgment, in a separate opinion, with which TITONE, J., concurs.

Judgment of the Supreme Court, Kings County, rendered May 26, 1978, reversed, on the law, and new trial ordered.